CHARLES H. EYERLY *v.* MARGARET BAKER
[No. 7, April Term, 1935.]

*Decided May 3rd, 1935.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Robert H. McCauley,* and *Walter C. Capper,* with whom were *Harold Tschudi* and *Semmes, Bowen & Semmes* on the brief, for the appellant.

*Grace R. Gerber Silverberg* and *Edward J. Ryan,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

Margaret M. Baker, the appellee, in attempting to leave Eyerly's Department Store in Hagerstown, Maryland, as she was entering a revolving door, was struck by one of the fins or wings of the door which had been put in motion by a person entering the store, and injured. She demanded of the appellant compensation for her injuries on the ground that they had been occasioned by his negligence, and the demand having been refused, she brought this action to recover for them. The trial resulted in a verdict and judgment in her favor, and from that judgment the defendant appealed.

The record presents four exceptions; the first three relate to the court's rulings on evidence, the fourth to its rulings on the prayers.

The declaration contains two counts, the first postulates the defendant's liability upon the hypothesis that the door itself was defective and unsafe, and the second upon the hypothesis that the injuries were caused by the negligent operation of the door by defendant's servant acting within the scope of her employment. The important questions submitted by the appeal are whether there was in the case evidence legally sufficient to permit a recovery upon either ground. In dealing with those questions, the truth of all evidence tending to support

either theory, together with such inferences as may naturally and legitimately be deduced from that evidence, will be assumed. Cases noted *Maryland Digest,* Supp. 4, p. 355.

The department store where the accident occurred is located on West Washington Street in Hagerstown, and is owned and operated by Charles H. Eyerly, trading as Eyerly's Department Store. The West Washington Street entrance to the store is furnished with a revolving door. That door consisted of four fins or leaves radiating at right angles to each other from the axis of a cylindrical well or compartment ninety-one inches high and eighty-four inches in diameter. The sides of the cylinder are interrupted to afford space to enter and leave the door. On the outer edge of each leaf or fin is a strip of rubber so adjusted as to be in contact with the sides of the cylinder, and on the top and bottom edge there is a strip of heavy felt. Those strips of rubber and felt serve a dual purpose, to keep out the dust and the weather, and to retard the revolution of the door on its axis. The fins are so constructed that they may be folded and pushed to either side, leaving unobstructed a central aisle fifty-eight inches wide.

Mrs. Baker had entered the store to make a purchase, and in leaving it she "stepped in the door" and raised her hand to grasp a rod placed on one of the leaves to facilitate the use of the door, when some person coming in, apparently from the street, "brought the door around and struck" her arm and whirled her back in the store. The in-coming person was identified by Mrs. Baker as Miss Louise Jane Musey, who was employed on another floor of the store as a saleswoman.

Mrs. Baker, in the course of her testimony, said that the rubber along the vertical edges of the leaves was torn, that it was "pretty bad," that she had noticed that on several occasions, that the door revolved "very fast," that it went around "very easy—didn't require the push," and when asked whether the door made a complete turn, said, "Yes, it went clear around as fast as it could go,"

She further testified: Q. Did you keep on around or did you go back in the store? A. Well, the door still kept going around and she said, I am sorry, I am sorry, I didn't see you. Q. Did the door stop? A. No, the door didn't stop. Q. And you were then outside the door? A. Yes, sir, I was standing in the store. It whirled me back in the store. Q. (Mr. McCauley) : And you say the door, even after you were whirled back in the store, the door kept on? A. The door still kept on going after she came in the store, like a door does; it kept going around until it slacked up. She was on the inside and swung it around and whirled me back in the store and she just walked around and said, I am sorry, I am sorry, I didn't see you. In describing the entrance of the person she identified as Miss Musey, she said, "this girl runs in and turns it around and threw me around and turns me clear back in the store and my arm was numb," that "she comes dashing in."

Mrs. Edna Baker, a daughter-in-law of the plaintiff, testified that on the afternoon of the day of the accident she was in the store and used the same door, that it "swung very easy," and that the rubber on the door was "very much worn and also the felt."

William Rohrer, a son-in-law of the plaintiff, testified that he had examined the door on Monday or Tuesday after the accident, and that when he "went in I noticed the door worked very easy and when I come out I looked the door over as to something to cause it to run easy and I found the strips were worn on the door, the weather strips that answer as wind breakers and they brake on the door." A motion was made to strike "that" out, and the court replied "all right." Just what "that" was or what was stricken out is not clear, nor is the doubt aided by the fact that later on counsel for defendant moved to strike out testimony by the witnesses Edna Baker and Rohrer that they "saw worn rubber on the edge of these fins." That motion was overruled, so that that testimony of Rohrer at least was in the case, and it is not possible to say what part of the answer was stricken out.

Henry W. Helfrich, a builder and contractor, said: "These doors are built inside of a glass case or part glass case in some instances or a circle with four partitions or compartments. In most every instance the doors have on the edge a rubber—sort of rubber wiper you might call it, which comes in contact with the glass enclosure so that when the doors revolve this rubber wiper wipes on the glass or enclosure and helps both to act as a brake to reduce the speed of revolving and also to keep out dust and the weather—cold air. That is practically about the only thing I would say it is on there for. When the rubber is worn the same thing would happen to that as to anything which would operate as a brake. If it were worn excessively it would not retard the door as quickly. In other words, the door would revolve more quickly without this braking surface than with it and at the same time it would leave in cold air and dust." On cross-examination he added: "When the door is put in operation with new rubber on the outside edge of the fins and then that rubber wears down it is good practice to adjust that rubber by moving it out to make it tight. After it is adjusted and moved out and put in good position the outside edge would still show the appearance of the original wear; the outside edge would show the wear. It would still be sufficient to brake the door provided it was new, soft rubber—provided the rubber had not been hardened or lost its resiliency to prevent it from being fairly air tight. These bands or strips are made to be adjusted so that they can be adjusted from time to time as the rubber wears down."

On behalf of the defendant there was evidence tending to prove that at the time of the accident the revolving door was folded back against the sides of the entrance and not in use at all, that Miss Musey did not meet Mrs. Baker at the folding door at the time of the accident, that she did not own garments similar to those which Mrs. Baker said were worn by the person who put the door in motion when she was injured, and it was undis-

puted that Miss Musey was employed on another floor of the building as a saleswoman, and that her duties had no connection with the use, operation, or maintenance of the door. Evidence was also offered to prove that the door was in good condition, and that it required a pull of from fifteen to twenty pounds to overcome the resistance of the felt and rubber strips on the leaves as they were adjusted at the time of the accident, and "it is not possible to revolve that door back in the opposite direction because the rubber is pressed back in sort of a rope, bunches up and obstructs the door, which makes it impossible to move it backwards."

There was also this testimony:

Mrs. Baker testified: "I went in Eyerly's between half past eleven and twelve o'clock but did not make a purchase on that day at Eyerly's; they did not have what I wanted. I had gone in the basement of the store. I wanted a pound box of Virginia Dare mixed chocolates. The clerk said he had a couple of boxes that were a couple months old and I asked him if they were fresh and he said no, and he told me he was expecting a shipment in a couple of days, and I said I would come in later then. * * * I then came up the steps and went to the door leading to West Washington Street. * * * I stepped in the door. The door was still and I stepped in the door and raised my hand to grasp the rod to go out on the street and, the instant I touched it, this clerk came in and brought the door around and struck my arm and whirled me back in the store and my arm was numb and I stood there stunned awhile and she came in around me and said, I am sorry, I am sorry, I did not see you, and she went on up stairs and kept looking back at me but she went on up stairs."

Miss Musey said: "On September 16th, 1933, my hours of employment were from eight to twelve—lunch hour has been from twelve to one ever since I have been in the store, which is eight years. On September 16, 1933, my lunch hour was from twelve to one. When I am ready to go out, the time register clock, from which our

time is determined, is at the office on the second floor on the east side. We register there. Our card is put in the clock and stamped with the time we go out, and when we come back and put our coats away we register at that clock again, that we are ready to work again. We do that when we get there in the morning and when we leave at night. When we go out to lunch and when we return. I did that on September 16, 1933. We do it every day. On September 16, 1933, when I went to lunch I did that day also. My lunch hour is always from twelve to one. Q. Were you out of the store at any other time on Saturday, September 16th, the day of this alleged accident, except during the lunch hour? A. We are never out on any other business on Saturday because Saturday is our busiest day.

From these facts it may be inferred that the accident occurred as a result of the concurrence of two factors, one, the mechanical condition of the door, which permitted it to revolve easily, the other, the sudden violent and unexpected impetus given it by the person who entered the store as Mrs. Baker was about to leave. If negligence may rationally be inferred from both, and it may further be inferred that the person responsible for the unexpected movement of the door was a servant of the defendant acting within the scope of her employment, it would naturally follow that the injuries of which the appellee complained were caused by the appellant's negligence, and that, in the absence of negligence on her part contributing to the accident, the appellant was entitled to recover.

For it is a settled principle of law that one who invites another upon his premises owes to the invitee the duty of exercising reasonable care to see that the premises upon which he is invited are reasonably safe. 45 *C. J.* 823; *New Theatre Co. v. Hartlove,* 123 Md. 78, 82, 90 A. 990; *Hochschild, Kohn & Co. v. Murdoch,* 154 Md. 575, 141 A. 905; *Benesch & Sons v. Ferkler,* 153 Md. 680, 683, 684, 139 A. 557; *Grzboski v. Bernheimer-Leader Stores,* 156 Md. 146, 148, 143 A. 706; *Dickey v. Hochschild, Kohn*

*& Co.*, 157 Md. 448, 451, 455, 146 A. 282; *May Co. v. Drury*, 160 Md. 143, 153 A. 61; *Belvedere Bldg. Co. v. Bryan*, 103 Md. 514, 64 A. 44. So where a storekeeper invites the public to come upon his premises to buy his wares, he is held to a positive affirmative duty to protect them, not only against dangers which may arise from some defect or unsafe condition of the physical property upon which they are invited to enter, but against dangers which may be caused by negligent acts of his employees, or even of customers, where, as a reasonably prudent person, he should have anticipated the possible occurrence and the probable results of such acts. 45 *C. J.* 825; cases cited *supra*.

The terms "safe," "unsafe," and "dangerous," as many other terms in the law of actionable negligence, are relative and not absolute. So while the massing of great numbers of persons in a storeroom on a bargain day may be unsafe or even dangerous to those who join the rush, the danger is a natural and necessary incident of the occasion, to which every one who attends contributes in some degree, and cannot justify imputing negligence to the storekeeper merely because he made the danger possible by issuing the invitation. But if he knew that the massing of many people in the storeroom would, because of some structural defect, be dangerous, negligence might be inferred either from the condition of the premises or from the invitation.

When, therefore, the evidence as to the operation of the revolving door is considered, it must be considered in connection with the use which the defendant should as a reasonably prudent person have anticipated would be made of it. His store was near a public square in Hagerstown, and it may be inferred was extensively patronized by the public. It was almost inevitable that frequently persons entering and leaving it would want to use the door at the same time, and that if it revolved too freely accidents might occur if persons going in opposite directions entered it at the same time. If only one person used it at a given time, the ease or freedom with which

it revolved would be immaterial, because the person using it could control its speed. So that in weighing the condition and operation of the door as evidence of negligence, they must be considered in connection with the probability that the door might be used by two or more persons at the time, under circumstances which might result in injury to them unless some device was used to control the speed of its revolution.

Such a device was used on the door in this case, but the evidence referred to, *supra,* allows the inference that it was permitted to become worn and inadequate to control the speed of the door within safe limits. That evidence was that the door revolved "very fast," that it whirled witness back into the store, that it went "clear around as fast as it could go," that it "kept going around until it slacked up," that the "rubber and felt edges" which acted as a brake were worn, and that when they were worn excessively their efficiency as brakes was impaired, unless they were adjusted, and that the door swung "very easy." It is true that the door was not put in motion by the plaintiff, but by another person attempting to enter the store. But the defendant should have anticipated that it might be so used, and that, if permitted to revolve too freely, it might injure one attempting to use it to leave the store as another entered it. These facts afford some evidence of negligence in the management and maintenance of the door.

While there is authority to the contrary, that conclusion is supported by what appears to be the weight of authority. In *Buzzell v. White Co.,* 220 Mass. 129, 107 N. E. 385, it was held that the fact that the rubber strips on the edges of the wings of a revolving door were worn was not evidence of negligence, where the purpose of the strips was not to retard the speed of the door, but to keep out air; but a contrary conclusion was reached by the same court in *Norton v. Chandler & Co.,* 221 Mass. 99, 108 N. E. 897, 898, where it appeared that the purpose of the strips was to prevent the door from revolving too rapidly, and that the strips were worn. In the case

last cited, it was held, too, that the fact that the accident was caused by the act of a customer who, in hurrying through the door, set it spinning, did not necessarily break the connection between the defendant's negligence and the accident. As to that the court said: "That a customer should go out through the revolving door in a hurry and so set it spinning was, or might have been found to be, something which the defendant ought reasonably to have anticipated. If that was so, or was found to be so, the connection between the two was not broken."

In *Hochschild, Kohn & Co. v. Cecil*, 131 Md. 70, 101 A. 700, the plaintiff, while passing through a revolving door, was struck in the back by one of the wings of the door which had been put in rapid motion by some person behind her. It was shown that the rubber on the edges of the wings was worn out and in bad shape, that the purpose of that rubber was to keep out the dust and the weather, to prevent injury to persons whose hands or fingers might be caught between the edges of the wings and the sides of the well, and to retard the speed of the door, that an ordinary push would cause the door to revolve several times. This court held that upon those facts the question of defendant's negligence was for the jury.

In *Hochschild, Kohn & Co. v. Murdoch*, 154 Md. 575, 141 A. 905, upon a showing that plaintiff, while passing through a revolving door, the wings of which had been folded back, was struck by one of them which suddenly collapsed and swung around and injured her, it was held that defendant's negligence was for the jury.

It follows that the appellant's A, B, C, and D prayers, which required the court to direct a verdict for the defendant on the ground that there was no evidence legally sufficient to permit her to recover at all, or to permit a recovery under the first count of the declaration, were properly refused.

Appellant, by his E and F prayers, prayed the court to instruct the jury that there was no legally sufficient

evidence to permit a recovery under the second count of the declaration, and those prayers were also refused.

It is conceded that Miss Musey, to whose act in setting the door in motion the appellee ascribes her injuries, was a saleswoman, that she was employed on another floor of the building, and that her duties had no possible connection with the use or operation of the door. Her act in putting it in motion was as independent of her duties as appellant's employee as the act of any stranger would have been, for she was using it as any person desiring to enter the store may have used it. It is true that she was returning to her employment, but it is not apparent why that fact alone should make the employer any more responsible for her acts than for the acts of a stranger entering the store in answer to an invitation for any other purpose. Nor would the fact that the accident occurred on the defendant's premises determine the master's liability, if the employment imposed upon the employee no duty in respect to the operation or control of the instrumentality which caused the injury, nor in respect to the general protection of patrons of the store.

It is axiomatic that the rule of *respondeat superior* is only applicable where the tortious act is committed by the servant within the scope of, or in the course of, his employment. *Labatt on Master and Servant,* secs. 2226, 2276; 39 *C. J.* 1289. But difficulty in applying it arises where it becomes necessary to determine the limits and bounds of the field which those phrases describe. That difficulty is illustrated by the great number of expressions which have been invented to adjust the principle to varying combinations of facts. *Labatt on Master and Servant,* sec. 2226. But however it may be described, an essential ingredient of the doctrine is that a master cannot be called upon to answer for a tort committed by his servant unless it was in some way and to some extent incidental to or in furtherance of the business which he set the servant to do. *Cooley on Torts,* secs. 391, 294, 396; *Labatt, Master & Servant,* sec. 2276; 39 *C. J.* 1293. Many cases illustrating the application of the doctrine

and the limitation are collected in *Cooley on Torts,* sec.
396; 39 *C. J., "Master & Servant"* sec. 1488, note 80; 27
*L. R. A.* 164 *et seq.,* note; 27 *L. R. A.* 177 *et seq., note;*
54 *Am. St. Rep.* 71, *note.* And in *Morier v. St. Paul etc.
R. Co.,* 31 Minn. 351, 17 N. W. 952, there appears an ad-
mirable summary of its essential elements as well as of
its limitations. The court there said: "A master is not
liable for every wrong which the servant may commit
during the continuance of the employment. The liability
can only occur when that which is done is within the real
or apparent scope of the master's business. It does not
arise when the servant steps outside of his employment
to do an act for himself not connected with his master's
business. Beyond the scope of his employment the servant
is as much a stranger to his master as any third person.
The master is only responsible so long as the servant can
be said to be doing the act, in the doing of which he is
guilty of negligence, in the course of his employment. A
master is not responsible for any act or omission of his
servant which is not connected with the business in which
he serves him, and does not happen in the course of his
employment. And in determining whether a particular
act is done in the course of the servant's employment, it
is proper first to inquire whether the servant was at the
time engaged in serving his master. If the act be done
while the servant is at liberty from the service, and pur-
suing his own ends exclusively, the master is not respon-
sible. If the servant was, at the time when the injury
was inflicted, acting for himself, and as his own master,
*pro tempore,* the master is not liable. If the servant step
aside from his master's business, for however short a
time, to do an act not connected with such business, the
relation of master and servant is for the time suspended.
Such, variously expressed, is the uniform doctrine laid
down by all authorities."

Tested by those principles, the evidence in this case
is not sufficient to charge the negligence of Miss Musey,
if negligence there was, to the appellant. At the time
of the accident, she was engaged in no duty which she

had been employed to perform. If she was at the door when the accident occurred, and she says she was not, it was at a time when she was not engaged in the performance of any duty for the master; she was under no duty to inspect the door or to supervise its operation, and she used it in the same way that any patron of the store would have used it, as a convenient means of ingress and egress to and from the store.

The defendant's E and F prayers should, therefore, have been granted. And since it was within the province of the jury to find that Miss Musey's alleged act in setting the door in motion was the proximate cause of the accident, the error was injurious, for upon the whole evidence the jury could have found either that the accident was caused by Miss Musey's normal use of the door while it was in a defective condition, or by her negligent use of it while it was in a normal condition, for she testified that she had never "bumped" any one while using the door. But the effect of refusing those prayers was to permit the jury to find for the plaintiff even if they believed that the negligence of Miss Musey was the proximate cause of the accident. For the same reason, defendant's special exception to plaintiff's third prayer should have been granted and that prayer refused. The objections to the rulings in respect to the other prayers were not pressed in this court, and need not be considered.

The first three exceptions relate to the action of the trial court in permitting witnesses to testify as to the apparent condition of the door and the relative speed at which it revolved. These objections lack substance. There was no apparent reason why these witnesses who saw the door should not have told what it looked like, since it was not contended that its condition was not the same when the witnesses saw it as when the accident occurred, nor why, if they saw it in motion, they could not say whether it revolved easily, or rapidly, or slowly. Such expressions are in a sense opinions, but they are also "knowledge at shorthand," and as said in *Baltimore & Y. T. Road v. Leonhardt*, 66 Md. 70, 78, 5 A. 346, 351;

"In speaking of a precipice, or of the condition of a road, which is founderous or dangerous for travel, or of numbers, weights, heights, distances, and other like subjects, it would rarely be practicable for a witness to give the jury a satisfactory idea of the thing described without stating his opinion of them." There was therefore no error in these rulings. But for the errors indicated, the judgment appealed from must be reversed.

*Judgment reversed, with costs, and case remanded for a new trial.*