DALMO SALES OF WHEATON, INC. ET AL. *V.*
DOROTHY L. STEINBERG ET VIR

[Nos. 121 and 210, September Term, 1979.]

*Decided October 18, 1979.*

The cause was argued before WILNER, COUCH and WEANT, JJ.

*Albert D. Brault,* with whom were *Stephen H. Ring* and *Brault, Graham, Scott & Brault* on the brief, for appellants.

*Edward H. Kerman,* with whom was *Lawrence P. Mann* on the brief, for appellees.

WILNER, J., delivered the opinion of the Court.

On December 4, 1974, Dorothy Steinberg decided to do some Christmas shopping. She should have stayed home; for as she was walking along a sidewalk in front of an appliance store, a car operated by Peter Vida came across the sidewalk from an abutting parking lot, struck her, and pushed her through the store window. Her injuries were serious, painful, and permanent. As a result of this occurrence, in a multi-count Declaration filed in the Circuit Court for Montgomery County, Mrs. Steinberg and her husband sued Vida, Northwestern Mutual Life Insurance Co. (Northwestern), and Dalmo Sales of Wheaton, Inc., Luskin's of D.C. & Va., Inc., and Luskin's-Dalmo, Inc. (collectively called Luskins).

The action against Vida was based upon his alleged negligence in operating the vehicle that struck Mrs. Steinberg. The other defendants are, respectively, the owner of the real property upon which the appliance store, the sidewalk, and the adjacent parking lot are located (Northwestern) and an assignee of a sublease of said property who was, at the time of the occurrence, actually in possession of it (Luskins).

The claims made against Northwestern and Luskins were that (1) the store, sidewalk, and parking lot were "occupied, maintained, and controlled" by them, (2) they negligently maintained the sidewalk and parking lot in a dangerous and defective condition by failing to maintain a curb or other barrier that would prevent the encroachment of the sidewalk by vehicles from the parking lot or otherwise retard or halt vehicular traffic across the sidewalk, (3) they knew or should have known that such deficiencies might create an unreasonable risk to people using the sidewalk, and (4) Mrs. Steinberg's injuries were a direct result of that negligence.

After trial, a jury returned a verdict of $580,000 in favor of the Steinbergs and against all defendants. The court, in post-trial proceedings, reversed the award against Northwestern by entering judgment *non obstante veredicto* (N.O.V.) in its favor, but by denying similar relief to Luskins, allowed the verdict to stand against it. Vida sought no post-trial relief either in the Circuit Court or here, and we are

therefore not concerned with the action or judgment against him. What we have is an appeal by Luskins from the judgment against it and a cross-appeal by the Steinbergs from the judgment N.O.V. in favor of Northwestern.

A resolution of the several issues raised in these two appeals requires, of course, some understanding of the circumstances that led to this unfortunate episode; and that preliminarily, necessitates a description of the scene of the accident. Here, a picture is truly worth a thousand words. To conserve as many of those words as possible, the Court will use the diagram below which, though not drawn precisely to scale, is based upon the testimony and exhibits in the case and, we think, fairly depicts the scene.

SC: Steinberg car
S: Steinberg
V: Vida car
O: Ogden car
X: Point of impact

As we hope is evident from this unprofessional diagram, Mrs. Steinberg, having parked her car around the corner, was proceeding along the sidewalk and was about to enter the Luskins store when she was struck by the Vida car. The front of the Luskins store consisted of a metal-skinned wooden base 16 inches high, on top of which was store window plate glass.

A critical fact in this case, in terms of whether Luskins or Northwestern have any liability to Mrs. Steinberg, is that there was no barrier, in the form of a curb, wheel blocks, or bollards, to inhibit automobiles parked or being driven on the parking lot from encroaching on the sidewalk. The evidence showed that the parking lot sloped up to meet the sidewalk at grade, leaving somewhat of a rut or gully just before the two joined. If a person pulled a standard sized vehicle up to the point that the front tires settled into this gully — *i.e.,* nearly flush with the beginning of the sidewalk, the car would overhang or encroach upon the sidewalk by some two and a half feet, leaving then only three and a half feet for pedestrian traffic. The encroachment would be even greater if the car were backed into such a position, because the trunk overhang exceeds that of the hood.

The car that struck Mrs. Steinberg belonged to Mr. Vida's roommate, Paul Riggs. It was a 1966 Oldsmobile Delta 88, that had a number of mechanical defects. The battery was weak; in cold weather, if the car did not start up right away, the battery was prone to give out, thus requiring a "jump start" to start the car. The car had an automatic transmission; however, (1) the linkage was so loose that the gear lever (and thus the gear) could slide from one position to another without substantial effort on the part of the driver — by just a touch of the finger, and (2) the gearshift indicator did not always reflect the true gear position, being off by one or one and a half positions. Thus, it was possible for the car, while parked, to be in a forward gear without the driver knowing of it. Finally — worst of all, and apparently unknown to Mr. Vida — there was evidence of a defective "neutral lockout switch", allowing the car to start while in a forward gear.

On the morning of December 4, 1974, Mr. Vida had some business to transact at the State Employment Security Administration office located across Georgia Avenue from the Luskins store. Finding no more convenient parking space, he parked the car on the Luskins lot in the space noted on the above diagram. He did not intend to transact any business with Luskins, and thus ignored a sign in the Luskins window

warning that parking on that lot was reserved for Luskins customers. Leaving the car, Mr. Vida crossed the street and attended to his business, returning an hour or so later. When his first attempt to start the car failed, Vida took off the emergency brake, put the car in neutral gear, and tried to push it from the front end. It moved, if at all, no more than a few inches.

At some point, the owner of the car parked immediately to Vida's left, one Susan Ogden, returned, and agreed to permit Vida to connect his jumper cables to her battery in an effort to start his car. Ms. Ogden repositioned her car to approach the left fender of Vida's car at an angle, in order to facilitate the booster operation. With the cables in place, but without resetting the emergency brake, Vida attempted once again to start his car, without success. He exited the car, adjusted the cables, and reentered the car through the front passenger door. Instead of sliding over to the driver's seat under the steering wheel, however, where he would have been in a position to apply the brake pedal, he lay across the front seat, his legs hanging out of the right front door, and from that position turned the ignition key. With its hood up and the cables attached, the car instantly jumped forward, its motor running, and struck Mrs. Steinberg as she was walking by. It is evident that either the engine started with the car already in gear or that the car slid simultaneously into a forward gear. Because the car had been sitting a while in forty-degree weather, the automobile choke was set so as to cause the car to run at a "high" idling speed. The impact pinned Mrs. Steinberg's legs against the 16-inch base and threw her torso backward through the plate glass window. Part of the window dropped on her legs in the manner of a guillotine.

With this background, we may proceed to consider the questions raised in these appeals, beginning with those presented by Luskins.

### I. Should The Court Have Directed A Verdict Or In The Alternative Granted Judgment N.O.V. In Favor Of Luskins?

Luskins does not dispute that, at the time of the accident,

Mrs. Steinberg was its business invitee; nor does it deny that it had a duty to exercise reasonable care to ensure that invitees such as Mrs. Steinberg could traverse the public portions of its property without unreasonable risk of injury to themselves. The crux of the issue here is whether that duty extended to the type of risk or exposure that unfurled itself in this case. Given the existing layout of the property, was the possibility that a car might come over the sidewalk and strike a pedestrian who was lawfully thereon a reasonably foreseeable one — one that Luskins had a duty to anticipate and guard against?

This is innately a question of law, but one that depends for its resolution upon the facts proved in the record. Because the issue arises in the context of whether a directed verdict (or judgment N.O.V.) should have been granted, we are dealing in essence with the question of whether the evidence in the case sufficed to establish the alleged duty and its breach, and thus to warrant submission of the case to the jury and to sustain its verdict. In considering this issue, then, we must assume the truth of all evidence (together with all inferences that may naturally and legitimately be deduced from it) tending to support Steinberg's factual allegations and theory of recovery. *Moran v. Faberge,* 273 Md. 538 (1975); *Eyerly v. Baker,* 168 Md. 599 (1935); *Buchanan v. Galliher and Harless,* 11 Md. App. 83, 87 (1971).

In this regard, the record reveals that the property in question was originally developed in 1952 by People's Drug Stores for its own use. Early in 1953, People's sold the property — building, sidewalk, and parking lot — to Northwestern, which, in turn contemporaneously leased it back to People's under what has been characterized as a "net net net" lease. People's used the property as a drug store until 1967, when it subleased it to a paint store. Luskins came into possession in February, 1974, some ten months before the accident, by virtue of an assignment of the sublease.

Although neither the prime lease to People's, the sublease, or the pertinent assignment of the sublease was offered into evidence, it was conceded, through Admissions of Fact, that Luskins "had control over the sidewalk and parking area

adjacent to the front entrance" of the store, and that it had exercised that control by (1) assuming the cost of illuminating the sidewalk and lot, (2) posting warning signs advising that parking was reserved for Luskins customers only and that violators would be towed away, (3) using its employees to paint yellow stripes on the blacktop lot in order to designate parking stalls, (4) assuming responsibility for removing ice and snow from the sidewalk and parking lot and using its employees to perform that work, (5) closing off part of the lot during hours when the store was closed in order to restrict public use of the lot, (6) using part of the lot for trash storage, and (7) occasionally using part of the sidewalk to display lawnmowers and other appliances.

There was no evidence that, in the 21-year history of the building, anyone on the front sidewalk had ever been injured by reason of an encroaching automobile, much less a run-away one; apparently, this was the first incident of such personal injury. However, there *was* evidence that the encroachment by automobiles had been a problem in the past, and that Luskins, through its supervisory employees, had been made aware of the problem. An adjacent storekeeper, Mr. Blacker, whose store faced the same parking lot, testified about three incidents, at least two of which had occurred prior to the Steinberg tragedy, in which cars had crashed into his storewindow. The second incident, he said, occurred in the summer of 1974, and he warned a Luskins salesman (whom he thought was a manager) that one day "somebody is going to get hurt bad." On one other occasion, Blacker himself ran into one or more lawnmowers that Luskins had sitting on the front sidewalk, and advised Luskins' cashier of what had happened.

James Stehman, a former Luskins employee, confirmed much of what Blacker said. He was the salesman Blacker warned following the second window incident, and Stehman said that he had told the Luskins sales manager about that incident as well as about the lawnmowers getting hit. Stehman testified that automobiles "frequently" parked up on the sidewalk, and that "[s]everal times we have had to have people move their cars back to allow merchandise to get out

of the store. . . ." At one point, in the summer of 1974, Stehman said that he suggested placing poles (bollards) in front of the store and was told by a Luskins official that if he wanted to install such poles *he* was free to do so. The company itself would not see to it. Finally, there was evidence of a number of bollards and one or more wheel blocks that were lying loose on the parking area around the corner of the building (where Mrs. Steinberg parked her car). They, or others costing between $40 and $80 each, could have been easily installed in front of the store.

George Frangos, qualified as an expert in traffic engineering, testified that for at least 25 to 30 years, it has been a "common and standard practice" to separate parking spaces from pedestrian walkways by the use of curbs, wheel blocks, or bollards. Although there may have been no "legal" requirement, in the sense of a State or municipal regulation, that this particular property contain such a barrier,[1] Frangos stated that the property (by reason of the absence of such a barrier) "was not consistent" with this quarter-century old practice. The minimum standard curb height, he said, is six inches, and the standard height of a wheel block is eight inches.

Both sides (Steinbergs and Luskins/Northwestern) conducted a variety of tests with 1965 and 1966 Oldsmobiles of the same model and with essentially the same weight, characteristics, and equipment as the vehicle "driven" by Mr. Vida. Although there was some confusion, some conflict, and a great deal of technical explanation with respect to these tests, suffice it to say that there was evidence presented tending to show that had there been a standard six-inch curb separating the lot from the sidewalk, or bollards, or either five- or eight-inch wheel blocks in place, Mrs. Steinberg may not have been hit by the Vida car, and, if hit, may have

---

1. There was in effect at the time a Montgomery County ordinance requiring in general that sidewalks be separated from parking spaces by curbing, and that, in off-street parking areas, sidewalks be protected from vehicular overhang by wheel bumpers, curbs, five foot spacing, or other approved method. See 1972 County Code, § 59-67(d) and (h). Luskins contends, without substantial debate from Steinberg, that its property was exempt from this statutory requirement; and, for purposes of this appeal, we shall assume the validity of that contention.

escaped her most serious injuries. The evidence in this regard most favorable to Steinberg either indicated directly, or allowed a permissible inference, that the vehicle would not have mounted and overrun either a six-inch curb or standard-sized wheel blocks, and that, if it did manage to get over such obstacles, it would have been sufficiently delayed in its forward motion to have allowed Mrs. Steinberg to reach the relative safety of the entranceway.[2]

The Court of Appeals has long recognized as a settled principle of law that a storekeeper "is not an insurer of the safety of persons who come there upon his invitation to do business with him, that his obligation is one for the exercise of care for their safety such as an ordinarily prudent man would exercise, and any liability on his part for injury to a patron could be based only upon a failure to exercise that care." *Hochschild Kohn & Co. v. Murdock,* 154 Md. 575, 578 (1928); *New Theatre v. Hartlove,* 123 Md. 78, 82 (1914). In *Eyerly v. Baker,* 168 Md. 599 (1935), the Court acknowledged those principles, and some of the earlier cases establishing them, but went on to explain them in this way (p. 607):

> "So where a storekeeper invites the public to come upon his premises to buy his wares, *he is held to a positive affirmative duty to protect them,* not only against dangers which may arise from some defect or unsafe condition of the physical property upon which they are invited to enter, but against dangers which may be caused by negligent acts of his employees, or even of customers, where, as a reasonably prudent person, he should have

---

2. It is not necessary in this Opinion to recount all of the specific and somewhat technical evidence in this regard. Some of the tests showed that, with the vehicle placed up against or close to either a curb or wheel blocks and starting in gear at high idling speeds, it would not mount and overrun the barrier. Other tests showed differing results. Luskins' expert witness, who had conducted a similar range of tests on its behalf, conceded that, at the very least, such a barrier would likely delay the progress of the car between 2/10 and 9/10 of a second. Other testimony established that, when hit, Mrs. Steinberg was but a half pace from the entranceway, and could have reached it within a half second.

anticipated the possible occurrence and the probable results of such acts." (Emphasis supplied.)[3]

Both sides point to the expression "positive affirmative duty to protect" customers as being of significance. Luskins views it as somewhat of an alarming departure from the traditional manner of expressing a storekeeper's duty, and as suggestive that a storekeeper may indeed be an insurer of his customers' safety. Read in context with the balance of the sentence, however, we do not share Luskins' view or apprehension. The "positive affirmative duty" referred to is to protect customers against unsafe conditions or the negligent acts of others *where the storekeeper reasonably should have anticipated the possible occurrence and the results therefrom.* This is no different, in theory or effect, from the more traditional statement of the duty as exercising reasonable care for their safety. The standard is still one of reasonableness, and critical elements of that standard are proximate cause and foreseeability. This is clear from the cases that followed *Eyerly,* some of which continued to use, or quote approvingly, the expression "positive affirmative duty." *See, for example, Scott v. Watson,* 278 Md. 160 (1976); *Litz v. Hutzler Brothers Co.,* 20 Md. App. 115 (1974). *Compare Evans v. Hot Shoppes,* 223 Md. 235 (1960), and *Lloyd v. Bowles,* 260 Md. 568 (1971), in which the *Eyerly* terminology is not used, but the language of Restatement of Torts, § 343 is held to express the "general principle" applicable in this regard.[4]

---

**3.** Eyerly v. Baker arose from injuries sustained by the plaintiff while attempting to leave the defendant's store through a revolving door. As the plaintiff was exiting, a store employee, returning to work from her lunch hour, pushed one wing of the door in order to enter the store. The door spun around striking the plaintiff. She thereupon sued the storekeeper in two counts of negligence: count one alleged that the door itself was defective and dangerous; count two alleged negligence on the part of the employee, which the plaintiff attempted to impute to the employer. That part of the aforequoted language dealing with the "negligent acts of his employees, or even of customers" refers to the second count.

**4.** Section 343 of the Restatement (2d) provides:
"A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

Some confusion, particularly with respect to the elements of proximate cause and foreseeability, arises from the fact that the cases involving a storekeeper's liability for injuries to his invitee appear to fall into at least three categories; and, although the same general principles govern all three categories, the application of and mode of expressing those principles tends to vary somewhat. One category is where the injury arises from the negligent or deliberate act of a third party committed on the storekeeper's property but does not involve any defect in the property itself. In that situation, except in rather extreme circumstances, the principles of reasonableness, ordinary care, proximate cause, and foreseeability have often combined to prevent a recovery. *See, for example, Scott v. Watson, supra; Nigido v. First Nat'l Bank,* 264 Md. 702 (1972); *Litz v. Hutzler Brothers Co., supra. Compare* Restatement of Torts 2d, § 344.

The second and third categories do involve some defect in the property, the distinction between them being whether the potential for harm that is latent in the defect requires activation by the act or omission of a third party. Some types of defects have the capability of causing injury directly to whomever comes into contact with them, without the need for a concurrent act or omission by anyone else. Slipping or tripping over wet or greasy spots on the floor, cracks or holes in a pavement, or hard-to-see obstacles in a public aisle or passageway are common examples of this second category of cases. *See, for example, Evans v. Hot Shoppes, supra; Chalmers v. Tea Company,* 172 Md. 552 (1937); and *compare Lloyd v. Bowles, supra. See also* Restatement of Torts 2d, §§ 343, 343A. The other type of property defect — or unsafe condition — is more passive; absent the independent act or omission of a third person, it would, of itself, be incapable of producing the injury complained of. Injury in these cases results not solely from the condition itself, or from the injured person's contact with it, but rather from the combination of the condition and the independent action of another person

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
(c) fails to exercise reasonable care to protect them against the danger."

or object. *Eyerly* and the other revolving door cases are clear examples of this category. *See,* in addition to *Eyerly, Hamill v. Union Trust Co.,* 241 Md. 219 (1966); *Litz v. Hutzler Bros., supra.*

This case, of course, falls squarely within this third category. Mrs. Steinberg's injuries are alleged to have resulted from the coincidence of Mr. Vida's negligent operation of his roommate's defective vehicle *and* the lack of a barrier sufficient to avert or delay the encroachment of the sidewalk. With respect to this category of case, the elements of proximate cause and foreseeability become somewhat more complex than in the normal action for negligence. As to proximate cause, the court is called upon to look at two independent causative factors and to weigh, as against the other, the relative significance of each in causing the injury; and as to foreseeability, the court must consider the reasonableness of anticipating the occurrence of harm from the combination and interaction of the two factors, rather than from either alone.

The Court of Appeals addressed such a situation in *State v. Hecht Co.,* 165 Md. 415 (1933),[5] and concluded, at p. 422:

> "If the negligent acts of two or more persons, all being culpable and responsible in law for their acts, do not concur in point of time, and the negligence of one only exposes the injured person to risk of injury in case the other should also be negligent, the liability of the preson (sic) first in fault will depend upon the question whether the negligent act of the other was one which a man of ordinary experience and sagacity, acquainted with all the circumstances, could reasonably anticipate or not. If such a person could have anticipated that the intervening act of negligence might, in a natural and ordinary sequence, follow the original act of negligence, the person first in fault is not released from liability by reason of the intervening negligence of another."

5. The "use Plaintiff" there was a child who fell into an elevator shaft. The action against the storeowner was for negligently failing to provide proper safeguards to the shaft.

The same principle was restated more recently in *Little v. Woodall,* 244 Md. 620 (1966).[6] At page 626, the Court noted:

> "It is true that, generally, a plaintiff cannot recover if it appears from his own testimony that the danger complained of could have resulted either from a breach of duty owed by the defendant to the plaintiff or from some other cause for which the defendant is not responsible. . . . That rule however, in the circumstances here present, must be taken in conjunction with the principle of proximate causation that *if the situation wrongfully created by the defendant increased the risk of damage through the operation of another reasonably foreseeable force, the defendant is liable for the ensuing loss. . . . The question of reasonable foreseeability, as part of the question of proximate causation, is ordinarily a question for the jury.*" (Emphasis supplied.)

In part, of course, this but begs the question of whether Mr. Vida's runaway car was "another reasonably foreseeable force." The accident was, as Luskins claims, a "freakish" one. It would, indeed, require a wide, loose, and vivid imagination to predict or foresee the strange combination of circumstances that actually led to this tragedy. But, in the context of actionable negligence, that is not what the element of foreseeability requires.

In *Segerman v. Jones,* 256 Md. 109 (1969), an action for negligence in which foreseeability of the harm that occurred was the principal issue, the Court, at page 132, adopted as "well stated" the following language from *McLeod v. Grant County School Dist.,* 255 P.2d 360 (Wash. 1953):

> "Whether foreseeability is being considered from the standpoint of negligence or proximate cause, the pertinent inquiry is not whether the actual harm was of a particular kind which was expectable. *Rather,*

---

**6.** Although Little v. Woodall was an action for breach of warranty rather than for negligence, the principles stated as to proximate cause and foreseeability were held to apply equally to negligence actions. *See* Moran v. Faberge, *supra,* 273 Md. 538, at 552 (footnote 9).

*the question is whether the actual harm fell within
a general field of danger which should have been
anticipated."* (Emphasis supplied.) [7]

In *Moran v. Fabergé, supra,* 273 Md. 538, the Court
readopted this statement and held it to be consistent with the
test as expressed by Harper (*A Treatise on the Law of Torts,*
§ 7 (1933)), which the Court also quoted with approval, 273
Md. at 551:

> ". . . 'the courts are perfectly accurate in declaring
> that there can be no liability where the harm is
> unforeseeable, if *"foreseeability" refers to the
> general type of harm sustained.* It is literally true
> that there is no liability for damage that falls
> entirely outside the *general threat of harm* which
> made the conduct of the actor negligent. *The
> sequence of events, of course, need not be
> foreseeable. The manner in which the risk
> culminates in harm may be unusual, improbable and
> highly unexpectable, from the point of view of the
> actor at the time of his conduct. And yet, if the harm
> suffered falls within the general danger area, there
> may be liability, provided other requisites of legal
> causation are present.'* " (Emphasis added by the
> *Moran* Court.)

It would seem clear from *these* expressions that, in terms
of establishing both general negligence (*i.e.,* the duty owed
and its breach) and proximate causation, foreseeability is not
to be viewed in the narrow context suggested by Luskins.
Under these precepts, it is not the "freakish" chain of
circumstances that actually occurred here that must be
reasonably foreseeable, but rather the more general class of
harm that might occur to invitees walking upon the sidewalk
from the movement of encroaching vehicles. *See Capital
Raceway Prom. v. Smith,* 22 Md. App. 224, 232 (1974). Such
harm could result from a variety of forms of negligent driving

---

7. The Court also observed that the language quoted above from State v.
Hecht Co., 165 Md. at 422 was a formulation of "[s]ubstantially the same
rule." 256 Md. at 132.

— from failing to stop in time while attempting to park, to placing the car in the wrong gear while attempting to leave, and much in between. The risk is the result of encroachment, whatever the circumstances that may lead to it.

The courts in other States have taken differing approaches to a storekeeper's liability for injuries occasioned by encroaching vehicles. Some courts have followed the lead of Texas in *Watkins v. Davis,* 308 S.W.2d 906 (Tex.Civ.App. 1958), and concluded that, where the immediate cause of the injury is the encroaching motion of a vehicle, there is no liability based upon an unsafe condition of the property — the lack of a barrier — unless that condition itself contributed to the *initial movement* of the vehicle. The theory in support of that proposition is that where the injury results from the loss of control of a vehicle, "the occurrence falls within the domain of the unusual and extraordinary, and therefore, in contemplation of law, of the unforeseeable." 308 S.W.2d at 909. *See also Schatz v. 7-Eleven, Inc.,* 128 So.2d 901 (Fla.App. 1961); *Mack v. McGrath,* 150 N.W.2d 681 (Minn. 1967); *Nicholson v. MGM Corporation,* 555 P.2d 39 (Alaska 1976), each denying liability.

Other courts have declined to deny liability as a matter of law, but have concluded that the issues of negligence, foreseeability, and proximate cause are more properly for a jury to determine. *See, for example, Ray v. Cock Robin, Inc.,* 293 N.E.2d 483 (Ill.App. 1973), *aff'd* 310 N.E.2d 9 (Ill. 1974); *Denisewich v. Pappas,* 198 A.2d 144 (R.I. 1964); *Barker v. Wah Low,* 19 C.A.3d 710 (Cal.App. 1971); *Beaney v. Carlson,* 189 N.E.2d 880 (Ohio 1963). *See also Munford, Inc. v. Grier,* 221 S.E.2d 700 (Ga.App. 1975), and *Chatman v. Church's Fried Chicken, Inc.,* 211 S.E.2d 2 (Ga.App. 1974), and *compare Feldman v. Whipkey's Drug Shop,* 174 S.E.2d 474 (Ga.App. 1970), and *Eckerd-Walton, Inc. v. Adams,* 190 S.E.2d 490 (Ga.App. 1972).

All of these cases, of course, proceeded upon somewhat differing fact situations, and distinctions of one sort or another can therefore be found in each of them. In *Watkins v. Davis,* for example, a runaway truck pushed aside a four-foot by eight-foot ice chest weighing 1500 pounds and came

crashing into a store, where it injured the plaintiff. The court first concluded that the plaintiff "was in no position to complain of lack of concrete curb as protection" since "a much more formidible barrier" — *i.e.,* the ice chest — had proved unavailing. Thus, said the court, "the undisputed facts demonstrat[e] conclusively, we think, that the same damages would have been inflicted, despite the curbing. . . ." 308 S.W.2d at 909. Somewhat the same situation pertained in *Mack v. McGrath, supra,* where there was in fact a curb separating the sidewalk from the lot, but the car was driven with such force as to jump the curb and crash into the store. The court reasoned, 150 N.W.2d at 686:

> "Not only would a higher curb have been ineffective to stop a vehicle driven with the speed of the McGrath car, but it would have increased the inconvenience and hazard to pedestrians who were obliged to use it."

In *Schatz,* the vehicle in question jumped a 5¾-inch curb, and in *Nicholson,* it ran up and over a 10-inch curb.[8]

By way of comparison, there is, of course, in this case not only the absence of any barrier (other than the gully) between the lot and the adjacent sidewalk, but substantial evidence that had there been even a standard and common curb, bollard, or wheel block, Mrs. Steinberg may not even have been injured. Recognizing this important distinction, and upon the more general principles of Maryland law that we have recounted above, we conclude, as did the California court in *Barker v. Wah Low, supra,* 19 C.A.3d at 721, that:

> "Reasonable men could believe it was necessary to

---

8. The Florida intermediate appellate court has wavered somewhat since deciding *Schatz.* In Johnson v. Hatoum, 239 So.2d 22 (Fla.App. 1970), *cert. den.* 244 So.2d 740 (1971), the court distinguished *Schatz* and reversed a summary judgment for the storeowner where the plaintiff was injured on the sidewalk rather than in the store. In Krispy Kreme Doughnut Company v. Cornett, 312 So.2d 771 (Fla.App. 1975), however, it followed *Schatz.* Then, in Thompson v. Ward, 341 So.2d 837 (Fla.App. 1977), the Court again declined to follow *Schatz* and, based upon Johnson v. Hatoum, concluded that the issue of foreseeability was for the jury to determine. *See also* Cabals v. Elkins, 368 So.2d 96 (Fla.App. 1979). Save for the denial of *certiorari* in Johnson v. Hatoum, it does not appear that the Supreme Court of Florida has yet addressed the question.

have a barrier separating the waiting customers from those approaching, parking and leaving in vehicles. Reasonable men could believe that the barrier provided was inadequate. Reasonable men could believe that the possibility of a car jumping, lurching, or bolting forward because of mechanical failure, or negligence of the driver, although remote, was foreseeable, and that in balancing this possibility against the risk of harm to patrons ... it would have been no inordinate burden on the owners or operators, or to the patrons, to have installed a more substantial barrier protecting that particular area of the premises."

We do not mean to suggest that a storekeeper is bound to erect an impenetrable wall around his building or to protect his patrons from every manner or form of harm; he has no such duty. We conclude only that where there is evidence to establish, or fairly to support the inference, that the injury arose at least in part from an unsafe condition in the storekeeper's property, and that, as to the storekeeper, the *class of harm* that occurred was *reasonably* foreseeable *and could reasonably have been prevented or guarded against,* the issues of proximate cause and foreseeability are for the trier of fact to determine, and are not appropriate for resolution by directed verdict or judgment N.O.V. The court's rulings on these motions, therefore, were correct.

## II. Did The Court Err In Instructing The Jury On The Duty Owed By Luskins?

Luskins objects primarily to two portions of the court's instructions to the jury — that dealing with the general duty owed to its invitees and that concerning the element of foreseeability.

The heart of the first complaint was the court's use of the language from *Eyerly v. Baker, supra,* describing a storekeeper's duty as a "positive affirmative" one. Luskins zeroes in on this one statement as constituting an inappropriate use of verbatim language from a case involving a different factual setting and as improperly tending to

elevate a storekeeper's duty to that of an insurer of his patrons' safety.

Instructions, however, have to be read in context; and, when so read, it is clear to us that the restatement of *Eyerly* was not inappropriate. The court told the jury that a storekeeper "does not, of course, become an insurer of the safety of those who accept his invitation, but when the public is led to believe that premises have been offered for its entry, the law is clear that the occupant [storekeeper] assumes a duty of reasonable care to see that the place is safe for that purpose." It was at that point, and in that context, that the court instructed the jury that the storekeeper had a positive affirmative duty to protect his invitees against the dangers that may arise from defects in the property or the negligence of others, where "a reasonably prudent person should have anticipated the possible occurrence and the probable results of such actions." Viewed thusly, and for the reasons noted in the discussion of Luskins' first issue, we find no error in this instruction.

Luskins' second complaint, as to the instructions on foreseeability, is equally unfounded. The court quite properly paraphrased the language that the Court of Appeals had first adopted in *Segerman v. Jones, supra,* and later readopted in *Moran v. Fabergé, supra,* that "the precise manner in which an injury was brought about need not have been foreseeable. Rather, the question is whether the actual harm fell within a general field of danger which should have been anticipated. . . ." Alluding then to the Steinbergs' theory of what the general field of danger was, the court stated:

> "If you should find that the present accident was within the realm of foreseeability and you should find it was, if the danger of the injuries result was ever present, even though the manner in which the result was brought about may have had in it some aspect of unusualness."

For the reasons recited in Part I of this opinion, we find no error in this instruction. Although not the best rhetoric, it was a correct exposition of the law.

### III. Were There Errors In Rulings On Evidence That Require A New Trial?

Luskins makes three complaints about evidentiary rulings, none of which warrants reversal of the judgment against it.

It complains first that Messrs. Madison and Cobollero were allowed to testify as engineering experts when it was shown that neither of them is registered as an engineer in Maryland in accordance with the requirements of Md. Annot. Code, art. 75½. There are multiple answers to this complaint. First, although registration may be a prerequisite to the lawful practice of engineering in this State, it is not a qualification for testifying as a witness. Indeed, Luskins' counsel conceded as much at trial, arguing only that the witnesses were disqualified from rendering an opinion. Even if that were true, a point we need not decide, the fact is that neither witness rendered an opinion. They merely described the tests they had conducted and the results they had observed. Finally, it is clear that both of these gentlemen were fully qualified by training and experience, if not by registration, as automotive engineers. The court did not err in allowing them to testify.

Luskins next complains about the tests these gentlemen conducted, asserting that there was "no factual predicate" for certain of the conclusions reached. We find no error that would make their testimony inadmissible. At best, the complaint goes to the weight to be accorded their testimony, not to the right of appellees to present it or of the jury to hear it.

Finally, Luskins objects to the court's refusal to allow into evidence a "dictabelt" recording of a telephone conversation that an insurance investigator had with Susan Ogden — the person who allowed Mr. Vida to use her battery with his jumper cables. Luskins desired to use the recording for the purpose of showing that Ms. Ogden had made a statement therein that was inconsistent with her trial testimony. A transcript of the recording was available. It was used by Luskins in its cross-examination of Ms. Ogden and was admitted into evidence as a defense exhibit. Ms. Ogden

claimed that the transcript was not complete (which apparently was true, as there were ellipses indicating deletions). The point of dispute was Ms. Ogden's statement, revealed in the transcript, that the Vida car was going about 25 miles per hour when it struck Mrs. Steinberg. Ms. Ogden explained from the witness stand that she really didn't know how fast the car was going, and that the figure of 25 miles per hour had been suggested by the investigator.

Luskins' complaint rests upon the assertion that the recording itself, rather than the transcript of it, was the best evidence of what Ms. Ogden said. Given all of the circumstances attendant here — in particular the fact that Ms. Ogden admitted having made the 25 mile per hour statement as revealed in the transcript — we find no reversible error. If exclusion of the dictabelt was error at all, it was clearly harmless.

> IV. Was The Use Of Motion Picture Surveillance Of Defense Counsel Improper, Or Alternatively, Should The Film Have Been Produced For Inspection To Determine Whether It Should Be Admitted Into Evidence?

As noted earlier in this Opinion, both the Steinbergs and Luskins/Northwestern had a series of tests conducted with 1965 and 1966 Oldsmobiles to determine whether, under varying conditions, they would overrun curbs and wheel blocks of differing heights. Luskins ran three series of tests, the last of which was conducted on Luskins' rear parking lot on December 3, 1978 — the day before trial commenced. The tests that day were performed by Luskins' engineering expert, William Greene; also present, assisting and observing, was one of Luskins' trial attorneys. Unbeknownst to these gentlemen, however, was the fact that the entire operation was also being observed and filmed by agents for the Steinbergs.

Counsel for Luskins became aware of the surveillance during the cross-examination of Mr. Greene on the afternoon of December 8, 1978. Objecting both to the spying and to the fact that the existence of the film was not sooner disclosed

in answer to continuing interrogatories, counsel argued that he was "entitled to know what he [Steinbergs' attorney] is going to introduce." Appellees' counsel made clear that he did not intend to offer the film into evidence "unless it becomes necessary by virtue of this man's testimony at this point". It did not, in fact, become necessary, and the film was never offered. Cross-examination of Mr. Greene as to the conduct and results of the December 3 test proceeded without further incident.

As the film was never offered — and indeed as the only reference to it in front of the jury came from defense counsel — we find no reversible error in this case either in the surveillance itself or in the inaction of the court in the face of counsel's fulminations. The test results, as described by Mr. Greene, were not favorable to Luskins' position; and we presume that the film would have but confirmed those results.[9]

### V. Was It Error For The Defendants Luskins To Go To The Jury On Instructions Involving The Defendants Northwestern, Who Had Been Entitled To A Directed Verdict?

Without any citation of authority in support of its position, Luskins asserts that the jury may have been influenced by evidence of the financial wealth of Northwestern, and for that reason it was error for the jury to consider Luskins' liability together with that of Northwestern. The lack of authority is not surprising; the argument has no merit whatever, especially in light of the fact that Luskins made no request for a limiting instruction on this point.

---

**9.** Luskins complains as well that Steinbergs' attorney placed the film cannisters and some still photographs on the counsel table. They were not "exhibited" to the jury in any formal sense, but apparently the jury could observe their presence. Luskins now claims that this was an "indirect way of suggesting evidence to the jury". Aside from a demand to view the films, however, no particular relief or sanction with respect to their mere presence on the counsel table was requested from the trial court, and we shall therefore not consider this complaint on appeal. Maryland Rule 1085.

### VI. Did The Court Err In Granting Judgment N.O.V. In Favor Of Northwestern?

This is a restatement of the two issues raised by the Steinbergs in their cross-appeal, each of which in effect asks whether there was sufficient evidence of actionable negligence on Northwestern's part to make the question of its liability determinable only by the jury.

In our consideration of the first issue raised by Luskins, which in part is the converse of that presently before us, we concluded that there was sufficient evidence to establish (*i.e.,* to permit the jury properly to determine) that the condition of the property was unsafe, that the defect constituted a concurrent proximate cause of Mrs. Steinberg's injuries, and that, as to Luskins, the occurrence and the harm resulting from it were reasonably foreseeable. From this, we found that the issues of Luskins' negligence and consequent liability to the Steinbergs were properly submitted to the jury.

Some, but not all, of the evidence, inferences, and legal theories that led to our conclusions with respect to Luskins also apply to Northwestern. The whole of the case against the lessor need not, therefore, be repeated.

In *Sherwood Brothers, Inc. v. Eckard,* 204 Md. 485 (1954), and *Austin v. Buettner,* 211 Md. 61 (1956), the Court of Appeals adopted in general the principles set forth in Restatement of Torts, §§ 356 and 359 as expressing the conditions of a landlord's liability for injuries occasioned by dangerous conditions in or on his property.

Sections 355 and 356 of the Restatement (2d) make clear that, as a general rule, a lessor is not liable to his lessee or to others on the land "for physical harm caused by any dangerous condition which comes into existence after the lessee has taken possession" (§ 355) or "which existed when the lessee took possession." (§ 356) There are a few exceptions to this exoneration, however, one of which is stated in § 359. That section provides:

"A lessor who leases land for a purpose which

involves the admission of the public [10] is subject to liability for physical harm caused to persons who enter the land for that purpose by a condition of the land existing when the lessee takes possession, if the lessor

(a) knows or by the exercise of reasonable care could discover that the condition involves an unreasonable risk of harm to such persons, and

(b) has reason to expect that the lessee will admit them before the land is put in safe condition for their reception, and

(c) fails to exercise reasonable care to discover or to remedy the condition, or otherwise to protect such persons against it."

A number of cases around the country that have involved the concepts set forth in § 359, including some earlier Maryland cases, have analogized a lessor's liability to that of an owner who creates or maintains a nuisance; and, unfortunately, the term "nuisance" and the principles of law applicable to nuisances frequently appear in connection with the type of liability provided for in § 359. As the Court pointed out in *Sherwood* and *Austin,* however, despite the analogy, the liability under § 359 rests clearly upon the theory of negligence — not that of nuisance. *See Austin,* 211 Md. at 61, and *compare Edwards v. Chadwick,* 22 Md.App. 140 (1974).

Three of the Comments to § 359 are especially noteworthy, in the context of this case, in explaining the scope and meaning of the section. Comment a provides:

"The rule stated in this Section is an exception to the general rule of non-liability of the lessor for dangerous conditions existing at the time of the

---

10. The original Restatement, cited by the *Sherwood* and *Austin* courts, used the expression "admission of a large number of persons as patrons of his lessee" rather than "admission of the public." This limitation on the scope of § 359 was roundly criticized by Prosser (4th Ed., § 63, p. 404), and by the Court of Appeals in *Austin,* 211 Md. at 61. In this case, it would make no difference which of the two expressions is used.

lease, stated in § 356. The justification for the exception lies in the lessor's responsibility to the public, *which he is not free to shift to the lessee in any case where he has reason to expect that the lessee will admit the public before the land is put in reasonably safe condition for their reception."* (Emphasis supplied.)

The first sentence of Comment e carries forward this thought. It states that "[t]he liability is based upon the fact that the lessor knows that the land is to be thrown open to the public for entry, while it is in the same condition as when he gives possession to his lessee." Finally, comment i deals with the effect of the lessee's duty to repair, and makes clear that the lessor's liability is not affected by such a covenant if there is reason to believe that the dangerous condition has not been, or will not be, corrected. Comment i states:

> "The lessor is subject to liability for only such injuries as are caused to invitees of his lessee by the dangerous condition during the time within which the lessor had reason to believe that it would remain unchanged. The mere fact that a lessee is under a duty to make the premises safe or disclose their dangerous condition before admitting others, is not enough to entitle the lessor to expect that the land will be made safe after such time as is necessary to give the lessee an opportunity to perform his duty. Even the lessee's covenant to repair is insufficient to entitle the lessor to expect that the land will be made safe before the public is admitted. On the other hand, the lessor's liability is based upon the fact that he has reason to believe that the land will be used by his lessee for the admission of the public while its condition remains unchanged, and therefore a stipulation in the lease that the land is not to be open to the public until certain changes are made may be sufficient to entitle the lessor to believe that it will not be used unchanged."

Against the standards set forth in § 359, as adopted in *Sherwood* and *Austin,* we must apply what the Court said in *Fowler v. Smith,* 240 Md. 240, 246 (1965), and has repeated at least twice since: [11]

"Negligence is a relative term and must be decided upon the facts of each particular case. Ordinarily it is a question of fact to be determined by the jury, and before it can be determined as a matter of law that one has not been guilty of negligence, the truth of all the credible evidence tending to sustain the claims of negligence must be assumed and all favorable inferences of fact fairly deducible therefrom tending to establish negligence drawn. *Kantor v. Ash,* 215 Md. 285. Cf. *Suman v. Hoffman,* 221 Md. 302. *And Maryland has gone almost as far as any jurisdiction that we know of in holding that meager evidence of negligence is sufficient to carry the case to the jury. The rule has been stated as requiring submission if there be any evidence, however slight, legally sufficient as tending to prove negligence, and the weight and value of such evidence will be left to the jury."* (Emphasis supplied.)

The evidence, when read in this light (*i.e.,* most favorable to the Steinbergs), sufficed to establish that, when Northwestern purchased the property in 1953, it was, or should have been, aware that the parking lot would meet the sidewalk essentially at grade level, without benefit of a curb. Photographs taken from Northwestern's property files, together with certain correspondence between Northwestern and Peoples and testimony from a former owner of the adjacent building showed that the parking lot had not been completely paved at the time of purchase, in that the blacktop layer was still to be put on. This evidence also indicated, however, that, even without the blacktop layer, there was but an inch or so difference in height between the lot and the

---

11. *See* Curley v. General Valet Service, 270 Md. 248, 264 (1973); Beahm v. Shortall, 279 Md. 321, 341 (1977).

sidewalk, and that, when the blacktop was applied, the height differential would be negligible. There was no evidence to indicate any expectation on Northwestern's part that parking on the lot would be other than perpendicular to the sidewalk or that its tenant proposed to install a barrier of any type to impede encroachment of the sidewalk.

From this, there was a permissible inference that Northwestern knew, or should have known, both the condition of the property and the fact that that condition would not likely be changed before the public was admitted to the property. The key question, however, is whether there was sufficient evidence to show (1) that Northwestern knew, or, by the exercise of reasonable care, could have discovered, that the condition was a dangerous one — that it involved an unreasonable risk of harm to business invitees who would lawfully be coming onto the property and using the sidewalk, and (2) if so, that it failed to exercise reasonable care to discover the dangerousness of the condition and to remedy the condition or protect persons against it.

There was no evidence that Northwestern was aware, at any time prior to the Steinberg accident, of any problem of automobile encroachments at this or any other property owned by it. The incidents described earlier of which Luskins was made aware were never reported to Northwestern. The only evidence cited to the Court, or that the Court could itself find in the record dealing with what Northwestern knew or should have known in this regard was the testimony of Steinberg's traffic engineer George Frangos that the "standard practice" of separating sidewalks from adjacent parking lots by curbing, wheel blocks, or bollards extended "back over a period of 25 to 30 years that is documented in sources that go back at least that far." Expounding further on cross-examination, Frangos said:

> ". . . you are dealing with fundamentals, the subject of whether a sidewalk in [sic, and ?] an adjacent parking lot should be separated in fact and the provisions of a curb is so fundamental that most text written in the last ten years don't even deal with it.

It is considered as fundamental as how high you put a traffic sign, as to what the street level is in that regard. Most traffic analysts today would be surprised at the question that comes up when you have to resort, going backwards, to so many of the old sources to establish the base line of the discussion."

The inference that may be drawn from that is that if the practice of so separating sidewalks from adjacent lots was standard or fundamental 30 years ago, it was something that Northwestern, an experienced real estate investor,[12] should have known about when it purchased the property in 1953. Extending the inference one step further, if Northwestern is chargeable with knowledge of that standard practice, quite apart from what its own inspection of the property would have revealed, it may also be chargeable with knowing that a failure to comply with the standard might create a dangerous condition from which injury could arise.

The quantum and nature of a plaintiff's burden of proving negligence is summarized in *Curley v. General Valet Service, supra,* 270 Md. 248, and restated in *Beahm v. Shortall, supra,* 279 Md. 321 at 342:

". . . to meet the test of legal sufficiency, the party having the burden of proving another party guilty of negligence cannot sustain this burden 'by offering a mere scintilla of evidence amounting to no more than a surmise, possibility, or conjecture, that such other party has been guilty of negligence, but such evidence must be of legal probative force and evidential value.' [Citations omitted.] *The test of legal sufficiency, we have held, 'is whether the evidence serves to prove a fact or permits an inference of fact that could enable an ordinarily intelligent mind to draw a rational conclusion therefrom in support of the right of the plaintiff to recover.'* " (Emphasis supplied.)

---

12. There was evidence that Northwestern owned "several million" dollars in real estate in the Atlantic coast area.

In granting the judgment N.O.V., the court noted the absence of any direct knowledge by Northwestern that the condition of the property was dangerous, and concluded that the practice of designing parking lots so as to avoid encroachment of adjacent sidewalks, which may have been fundamental and well-known to traffic engineers, could not be imputed to the mere purchaser of the property.

We disagree. A practice that is safety-oriented and that was as common and fundamental as Mr. Frangos testified could well be imputed to a sophisticated commercial real estate investor such as Northwestern. The imputation is by inference, of course, but it is an inference fairly arising from Frangos' testimony. It is, we think, in the words of the Court of Appeals, "an inference of fact that could enable an ordinarily intelligent mind to draw a rational conclusion therefrom in support of the right of the plaintiff to recover."

Accordingly, we believe that the court erred in reversing the jury verdict by its entry of judgment N.O.V.

> *Judgment against Luskins affirmed; judgment N.O.V. in favor of Northwestern reversed; case remanded to Circuit Court for Montgomery County for entry of judgment against Northwestern in accordance with jury verdict; costs to be divided equally between appellant Luskins and cross-appellee Northwestern.*