*Ashley Moore v. CVS Pharmacy, Inc., et al.*, No. 371, Sept. Term, 2025.  Opinion by Arthur, J.

**PREMISES LIABILITY—DUTY TO PROTECT INVITEES FROM FORESEEABLE NEGLIGENCE OF OTHER INVITEES**

A storekeeper may have an obligation to use reasonable care to protect invitees against dangers caused by negligent acts of other invitees if a reasonably prudent person should have anticipated the possible occurrence and the probable results of those acts. Generally, where there is evidence to support an inference that an invitee's injury arose at least in part from an unsafe condition on the storekeeper's property, and that the class of harm that occurred was reasonably foreseeable to the storekeeper and could reasonably have been prevented or guarded against, the issues of proximate cause and foreseeability are for the trier of fact to determine.

Under the facts of the present case, a customer suffered injuries when another customer failed to stop a vehicle in a parking space and crashed the vehicle into the entrance of a retail pharmacy store.  The injured customer offered expert testimony from an engineer, who opined that the parking layout violated standard engineering principles by placing head-in parking spaces directed at the store entrance, without any bollard or other vehicle-stopping barrier.  Based on the evidence, a factfinder could reasonably conclude that the store proprietor knew or should have known that the arrangement of the parking spaces and store entrance presented an unreasonable risk of harm to invitees.  The store proprietor was not entitled to summary judgment merely because no similar incidents had occurred at the same store or at certain other nearby stores.

**SUMMARY JUDGMENT—GENUINE DISPUTES OF MATERIAL FACT**

When deciding a motion for summary judgment, the court must consider the record in the light most favorable to the non-moving party and construe all reasonable inferences against the moving party.  Under that standard, the evidence in the present case generated a genuine dispute about whether a parent corporation operated, managed, or controlled a retail store owned by a subsidiary corporation.  The parent corporation performed certain management functions under an agency agreement with the subsidiary corporation.  A supervisory employee of the parent corporation testified that the parent corporation's operation and management of the store included decisions about repairs and maintenance. Although an affidavit from an executive stated that the parent corporation did not directly operate or control the store, the parent corporation did not produce the agency agreement itself to provide the factual basis for that conclusion.  The parent corporation failed to show that it was entitled to summary judgment on the ground that it did not operate or control the store.

Circuit Court for Wicomico County
Case No. C-22-CV-23-000122

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 371

September Term, 2025

_____

ASHLEY MOORE

v.

CVS PHARMACY INC., ET AL.

_____

Arthur,
Shaw,
Meredith, Timothy E.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Arthur, J.

_____

Filed: May 29, 2026

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

*Albright, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

The plaintiff in this case suffered injuries inside a CVS pharmacy store, when a driver failed to stop a vehicle in a parking space and crashed through the glass entrance doors. The plaintiff claimed that the alleged owners and operators of the store created an unsafe condition by keeping parking spaces near the entrance without bollards or other devices to protect store patrons from vehicles.

One defendant moved for summary judgment, arguing that there was no evidence that it owned or operated the store premises. Another defendant moved for summary judgment, arguing that there was no evidence that it received actual or constructive notice of an unsafe condition on the store premises. The Circuit Court for Wicomico County granted both motions.

The plaintiff has appealed. For the reasons stated in this opinion, we conclude that the circuit court erred when it determined that there were no genuine disputes of material fact and that the defendants were entitled to judgment as a matter of law. Accordingly, we will reverse the judgment and remand the case for further proceedings.

## BACKGROUND

### A.    Injury to Ms. Moore at the Salisbury CVS Store

On the afternoon of December 10, 2019, Ashley Moore was a customer at a CVS pharmacy store located at a shopping center on South Salisbury Boulevard in Salisbury, Maryland. The store is a stand-alone business, not physically connected to other businesses, and is surrounded by its own parking lot. The store has a single entrance with glass sliding doors for all customers entering and exiting the store. An aerial photograph of the store is reproduced below:



The entrance doors are located at the lower-right corner of the building, positioned at a 45-degree angle relative to a row of parking spaces facing one side of the building and another row of parking spaces facing the adjacent side of the building. There is no curb or elevation difference between the parking spaces and the walkways provided for customers entering and exiting the building.

Four parking spaces located near the entrance along the right side of the building are accessible parking spaces reserved for persons with physical disabilities. Safety bollards, several feet in height, stand at the front of each of the accessible parking spaces. By contrast, the unreserved parking spaces along the other side of the building have no safety bollards. Each of the unreserved parking spaces has a "wheel stop," approximately six inches high. According to expert reports in the record, bollards can impede a vehicle

moving faster than 20 miles per hour. Wheel stops, however, are not designed to impede a moving vehicle but merely to alert the driver if a vehicle reaches the edge of the parking space.

A photograph of the store, showing the blue safety bollards in front of the accessible spaces and the absence of bollards in front of the other spaces, is reproduced below:



As Ms. Moore was leaving the Salisbury CVS store, another customer, Maria Belfort, drove a sport-utility vehicle into one of the unreserved parking spaces near the entrance. Ms. Belfort failed to apply the brake pedal to stop the vehicle. The vehicle ran over the wheel stop, crossed the pedestrian walkway, and crashed through the glass entrance doors. The vehicle struck Ms. Moore as she was walking through the entrance doors. She lost consciousness and suffered multiple fractures that required surgery. A photograph of Ms. Belfort's car, after she had driven it through the doorway of the store,

3

is reproduced below:



## B.    Negligence Claims

On September 26, 2022, Ms. Moore filed a complaint in the Circuit Court for Baltimore City.  The first count of the complaint raised a negligence claim against Ms. Belfort, alleging that the crash resulted from her careless operation of her vehicle.

Other counts of the complaint raised claims for negligence and premises liability against three companies: a Rhode Island corporation named CVS Pharmacy, Inc.; a Rhode Island limited liability company named CVS 8281 MD, LLC; and a Maryland limited liability company named Clairmont Center, LLC.  The complaint alleged that those companies "owned, operated, maintained, and managed" the Salisbury CVS store and "retained exclusive ownership, possession, control, and/or supervision" of the store. The complaint also alleged that those companies failed to exercise reasonable care to protect invitees from injury.

According to the complaint, when Ms. Belfort attempted to stop her vehicle at a

parking space near the entrance doors, she "pressed the accelerator instead of the brake[.]" The vehicle allegedly "encountered no resistance as it accelerated" toward the entrance "because there were no bollards or other devices" to protect the entrance and the customers using it. The complaint alleged that, if the defendants had installed bollards or similar protective devices in front of the entrance, the crash would not have occurred and Ms. Moore would not have suffered her injuries.

The complaint alleged that, during the decade before the incident, many other "incidents of vehicles driving though the front doors" occurred at CVS stores throughout the United States, including in Maryland. The complaint also alleged that the owners and operators of the store understood that "vehicles crashing through storefront entrances" were "a known hazard[]" in the retail industry. The complaint alleged that the store owners and operators knew that the parking spaces near the entrance lacked devices to protect against vehicles crashing into the entrance but failed to protect customers from that danger.

The complaint further alleged that, as a result of the crash, Ms. Moore suffered "serious, painful, and permanent physical and emotional injuries[,]" as well as "a substantial disruption to her quality of life." The complaint alleged that Ms. Moore required extensive medical treatment, suffered a loss of income, and will continue to require medical care in the future.

Although the complaint named CVS Pharmacy and CVS 2821 MD as defendants, those defendants did not file responsive pleadings. Rather, a party identifying itself as "Defendant Maryland CVS Pharmacy, LLC, . . . improperly pled as CVS Pharmacy, Inc.,

and CVS 8281 MD, LLC," filed an answer in which it denied liability. We shall refer to that defendant as "Maryland CVS."

Maryland CVS identified itself as a Maryland limited liability company and stated that it owns and operates the Salisbury CVS store. In addition to an answer, Maryland CVS filed cross-claims and third-party claims seeking indemnity and contribution from the driver, Ms. Belfort.

Clairmont Center and Maryland CVS moved to transfer the action to Wicomico County, where the accident occurred. The court granted the motions and transferred the action to the Circuit Court for Wicomico County.

During discovery, Ms. Moore designated John D. Boyd, a civil and environmental engineer, as an expert on parking lot design and related matters. Mr. Boyd opined that the layout of the parking lot and entrance at the Salisbury CVS store presented a hazardous condition. According to Mr. Boyd, it is inconsistent with standard design principles to place head-in parking spaces directed at a retail storefront used by pedestrians. Mr. Boyd opined that, to keep pedestrians reasonably safe, the operators of the store either needed to remove three of the unreserved parking spaces located near the entrance or to protect the entrance with barriers such as bollards or landscaping features.

Ms. Moore also designated Robert Reiter, a safety consultant, as an expert to testify about standards for the use of protective devices at retail businesses with parking lots. Mr. Reiter maintains a database that compiles public information about vehicle crashes at retail stores. Mr. Reiter opined that the history of vehicle crashes at CVS stores and other retail stores across the country should have alerted CVS entities of the

6

risk of vehicles crashing into storefronts.  Mr. Reiter also opined that it was not reasonably safe to place parking spaces facing the entrance to the Salisbury CVS store without bollards or other barriers to protect pedestrians.

### C. Discovery Disputes

When she served the complaint, Ms. Moore also served interrogatories and discovery requests on the three companies named as defendants.  Among other things, the interrogatories asked each defendant to identify the entities that owned or leased the store premises, as well as any documents governing the ownership, leasing, control, or management of the store.  The interrogatories also asked each defendant to disclose every incident in which a vehicle drove into a CVS store within five years of the accident and to disclose whether the defendant had ever been advised to install devices outside of any CVS store to protect patrons from vehicles.

Defendants CVS Pharmacy and CVS 8281 MD did not respond to any discovery requests.  Maryland CVS sent responses on its own behalf.

Maryland CVS disclosed that it had leased the store premises since May 2011 from Clairmont Center, the owner of the property.  Maryland CVS asserted that there had been no prior incidents in which a vehicle drove into the Salisbury CVS store within five years of the accident and that it never received advisements to install protective devices at that store.  Maryland CVS objected to many of the interrogatories, asserting that information about any stores other than the Salisbury CVS store was neither relevant nor reasonably likely to lead to the discovery of admissible evidence.

Ms. Moore moved to compel Maryland CVS to provide more complete responses

7

to her interrogatories, including the interrogatories about prior vehicle crashes and advisements to install safety devices. During a hearing on September 14, 2023, counsel for Maryland CVS asserted that it lacked access to some of the information sought because various "independent entities" own CVS stores throughout the country. Counsel told the court that "this particular CVS" store was part of a geographical "district" with "at least 12 stores[.]"

At the conclusion of the hearing, the court partially granted Ms. Moore's motion to compel. The court ordered Maryland CVS to disclose any incidents involving "a vehicle driving into a CVS store location for a period of five years before the occurrence" in the same "district" as the Salisbury CVS store. The court limited the scope of those compelled disclosures to incidents at a "similarly situated" store, which the court defined as a "stand-alone store with parking around it, not fronting a roadway." The court also ordered Maryland CVS to disclose whether "any store in the district similarly situated in terms of being a stand-alone store with parking around it" had ever been advised by government authorities to install protective devices outside the store.

After the court granted the motion to compel, Maryland CVS disclosed several incidents between 2014 and 2019 of vehicles crashing into CVS stores in the same district as the Salisbury CVS store. Although those disclosures are not part of the record, Maryland CVS asserts that there were "no prior incidents of a vehicle driving into the entrance doors" at any of those stores during that period.

One week after the discovery ruling, counsel for Ms. Moore emailed counsel for Maryland CVS to inquire why CVS Pharmacy had failed to provide any discovery

8

responses. Counsel for Maryland CVS asserted that "CVS Pharmacy, Inc. w[ould] not be responding to [Ms. Moore's] discovery requests" because "CVS Pharmacy, Inc. [was] not a proper defendant in this matter[.]"

Shortly after that email exchange, Ms. Moore moved to compel CVS Pharmacy to respond to interrogatories and requests for production of documents that she had served more than 11 months earlier. In its first filing in the action, CVS Pharmacy opposed the motion to compel. The attorneys who represented Maryland CVS also represented CVS Pharmacy.

CVS Pharmacy asserted that it was not "a properly named defendant" in the action and stated that it intended to move for summary judgment on that ground. The court marked the motion to compel discovery from CVS Pharmacy as "set for hearing," but never held any hearing or ruled on that motion.

In October 2023, Ms. Moore served notices to take the deposition of a corporate designee for CVS Pharmacy. The proposed topics included the ownership and management of CVS stores, contracts between CVS Pharmacy and other defendants, policies for accidents and injuries, policies for construction and maintenance of CVS stores, and prior incidents of vehicles driving into the entrance doors of CVS stores. Opposing counsel refused to produce a corporate designee for CVS Pharmacy. Instead, counsel identified "District Leader Dennis Pawlewicz" as the corporate designee for Maryland CVS and objected to the scope of many proposed topics.

During the deposition, Mr. Pawlewicz identified his employer as "CVS Health," which he understood to be synonymous with "CVS Pharmacy, Incorporated[.]" Mr.

9

Pawlewicz testified, to the best of his knowledge, that his employer "owns, operates and manages all of its retail pharmacy store locations," including the Salisbury CVS store. Although he lacked direct knowledge of what entity owned the Salisbury CVS store, Mr. Pawlewicz testified that he understood that the store is "a CVS corporate store that is owned by" his employer. Mr. Pawlewicz stated that he had never heard of "Maryland CVS Pharmacy, LLC[,]" until the deposition.

Mr. Pawlewicz testified that, in his role as district leader, he oversees 18 CVS stores in Delaware and four in Maryland. He had no knowledge of other incidents in which a vehicle crashed into the entrance of the Salisbury CVS store or another CVS store within that district. He stated that his employer's policies require store managers to report any incidents involving damage to store buildings or injuries to customers. Mr. Pawlewicz said that store managers use a centralized "service channel database" to make any requests for repairs or maintenance at a CVS store. This service channel database, he said, "covers a broad variety of things[,]" including "[l]ighting, plumbing, electricity, . . . carpeting[,]" and "[j]ust anything inside and outside th[e] four walls that are not functioning properly."

**D.     Motions for Summary Judgment**

On October 12, 2023, the defendants filed three separate motions for summary judgment: one on behalf of Clairmont Center; one on behalf of both CVS Pharmacy and CVS 2821 MD; and one on behalf of Maryland CVS.

In its motion, Clairmont Center acknowledged that it owned the shopping center on South Salisbury Boulevard but asserted that it did not operate, maintain, or control the

10

CVS store or parking area. In support of its assertions, Clairmont Center produced a copy of a ground lease agreement dated May 17, 2011. Under that agreement, Clairmont Center leased the property to Maryland CVS for the purpose of building and operating a CVS store on the property. As a term of their agreement, Maryland CVS promised to "keep and maintain . . . all buildings, curbs, landscaping, parking and driveway areas, and other improvements" on the premises.

In its motion, CVS Pharmacy contended that the evidence conclusively established that it "did not own, operate, control, or maintain" the Salisbury CVS store and, therefore, did not owe any duty to Ms. Moore. CVS Pharmacy asserted that it was merely the "parent corporation" of Maryland CVS and that Maryland CVS "owns, operates, manages, and controls" the Salisbury CVS store. As the only document in support of its motion, CVS Pharmacy relied on the ground lease agreement between Clairmont Center and Maryland CVS.

In its own motion, Maryland CVS admitted that it leases the store premises from Clairmont Center and that it operates and maintains the Salisbury CVS store. Maryland CVS asserted that the information produced during discovery showed that there were no incidents of a vehicle crashing into the entrance of the Salisbury CVS store or another CVS store in the same district within five years of the accident. Maryland CVS further asserted that there was no evidence that any store in the same district received advisements to install safety devices to protect against vehicles entering a store. In light of that information, Maryland CVS contended that it did not have actual or constructive knowledge or notice of a dangerous condition created by the parking spaces

11

near the store entrance.

After the filing of the summary judgment motions, Ms. Moore filed an "Amended Complaint by Interlineation." According to Ms. Moore, the purpose of the amendment was to correct a "misnomer" used to identify one defendant. The amended complaint replaced the name "CVS 2821 MD, LLC," with the name "Maryland CVS Pharmacy, LLC." Otherwise, the allegations remained unchanged from the original complaint.

Soon after filing the amended complaint, Ms. Moore filed a stipulation voluntarily dismissing her claims against Clairmont Center.

Ms. Moore opposed the summary judgment motions made by CVS Pharmacy and Maryland CVS. Ms. Moore argued that the deposition testimony from Mr. Pawlewicz, an employee of CVS Pharmacy, was sufficient evidence to establish that CVS Pharmacy owned, operated, managed, or controlled the Salisbury CVS store. Citing reports from her expert witnesses, Ms. Moore asserted that there was a long history of vehicle crashes at other CVS stores throughout the country and that the incident was reasonably foreseeable.

In a reply in support of its motion, CVS Pharmacy argued that the claims against it were an improper attempt "to pierce the corporate veil" and to hold it liable for the alleged negligence of Maryland CVS. CVS Pharmacy also asserted that "Mr. Pawlewicz was deposed, over objections, on topics on which he does not have the requisite knowledge or understanding[.]"[1] CVS Pharmacy asserted that, contrary to the testimony

_____

[1] Of course, Mr. Pawlewicz was Maryland CVS's designee under Maryland Rule 2-412(d). Consequently, Maryland CVS had an obligation to prepare him to give

12

of Mr. Pawlewicz, it does not own or operate the Salisbury CVS store.

Along with its reply, CVS Pharmacy provided an affidavit from Thomas Moffatt, a vice president for CVS Pharmacy, who also serves as president of Maryland CVS. Mr. Moffatt asserted that Maryland CVS directly owns and operates CVS stores in Maryland and that CVS Pharmacy does not directly own or operate any stores in Maryland. Mr. Moffatt further stated that Maryland CVS "entered into an agency agreement" with CVS Pharmacy, under which CVS Pharmacy "provide[s] certain services" to Maryland CVS and "act[s] on its behalf in things like field management, human resources, payroll processing, tax compliance and processing, and other similar administrative and management functions."

### E.    Grant of Summary Judgment and Entry of Final Judgment

After considering arguments at a hearing on November 29, 2023, the circuit court granted summary judgment in favor of CVS Pharmacy and Maryland CVS.

Addressing the motion made by CVS Pharmacy, the court stated: "I don't think there have been sufficient facts pled or alleged that would entitle the Plaintiff in this case to have a cause of action against CVS Pharmacy, Inc." Stating that "there was sufficient evidence in the record as it relates to [Maryland CVS] being on the lease, having sufficient control, and exercising that control over the property," the court concluded that CVS Pharmacy was entitled to judgment as a matter of law on the claims against it.

Addressing the motion made by Maryland CVS, the court concluded that there

---

complete and responsive testimony on all topics listed in the notice of deposition, unless it obtained a protective order.

13

was no evidence to establish that Maryland CVS had notice of an unsafe condition at the Salisbury CVS store. The court reasoned: "At this store, there were no prior accidents to put the store owner on notice or for it to be reasonably foreseeable that they needed to take further action to prevent or guard against the negligence of this third party." The court stated that it was "not convinced" that there was evidence showing that Maryland CVS was "on notice" that it needed to take further action or that the need to take further action was reasonably foreseeable to Maryland CVS.

After the court memorialized its summary judgment ruling, Ms. Moore moved for reconsideration. Ms. Moore noted that, because CVS Pharmacy refused to respond to any discovery requests, she "never had the opportunity to conduct any discovery on the nature and extent of [CVS Pharmacy's] operational and managerial control over the subject store." Ms. Moore asserted that, even without full discovery, the testimony from Mr. Pawlewicz and the affidavit from Mr. Moffatt created a genuine factual dispute over whether CVS Pharmacy operates or manages the Salisbury CVS store as an agent for Maryland CVS. Citing the expert report from Mr. Reiter, Ms. Moore asserted that there had been many prior incidents of vehicles crashing into storefronts at CVS stores throughout the United States. Ms. Moore argued that "[CVS Pharmacy] as agent, and therefore [Maryland CVS] as principal," had knowledge or notice of the risk of vehicles crashing into one of its stores.

On February 6, 2024, the circuit court denied the motion to reconsider the summary judgment ruling. Ms. Moore filed a notice of appeal one day after the entry of that order. Afterwards, Ms. Moore filed a stipulation in which she voluntarily agreed to

14

dismiss without prejudice her claims against Ms. Belfort, the driver who had crashed the vehicle into the Salisbury CVS store.

In an unreported opinion, this Court concluded that Ms. Moore's notice of appeal was premature because the circuit court had not entered a final judgment disposing of all claims against all parties. *Ashley Moore v. CVS Pharmacy, Inc., et al.*, No. 2339, Sept. Term 2023 (filed Feb. 6, 2025). We reasoned that, at the time when Ms. Moore noted her appeal, her claims against Ms. Belfort were still pending, as were Maryland CVS's cross-claims. We remanded the case under Md. Rule 8-602(g)(1)(B), for the circuit court to decide whether to direct the entry of a final judgment as to one or more but fewer than all parties.

After the remand, the parties jointly moved for an order directing the entry of final judgment as to fewer than all parties under Md. Rule 2-602(b). On April 17, 2025, the circuit court entered an order expressly finding that there was no just reason for delay and directing the entry of final judgment as to defendants Maryland CVS and CVS Pharmacy. Ms. Moore noted this timely appeal.[2]

## DISCUSSION

In this appeal, Ms. Moore seeks reversal of the order granting summary judgment in favor of CVS Pharmacy and Maryland CVS. This Court reviews the grant of a motion for summary judgment without deference to the circuit court. *See, e.g.*, *Jabbi v. Adventist*

---

[2] In the circumstances of this case, the court did not abuse its discretion in directing the entry of final judgment against Maryland CVS and CVS Pharmacy. *See Barclay v. Briscoe*, 427 Md. 270, 278 n.6 (2012); *Zilichickhis v. Montgomery County*, 223 Md. App. 158, 174 (2015).

15

*Healthcare, Inc.*, 264 Md. App. 659, 667 (2025) (citing *Oglesby v. Baltimore School Assocs.*, 484 Md. 296, 327 (2023)). As a general rule, "'absent exceptional circumstances, Maryland appellate courts will only consider the grounds upon which the [trial] court granted summary judgment[.]" *Irwin Indus. Tool Co. v. Pifer*, 478 Md. 645, 682 (2022) (quoting *State v. Rovin*, 472 Md. 317, 373 (2021)). Appellate review requires "'the same analysis that a trial court should make'" when deciding a motion for summary judgment. *Jabbi v. Adventist Healthcare, Inc.*, 264 Md. App. at 668 (quoting *District of Columbia v. Singleton*, 425 Md. 398, 406-07 (2012)).

A moving party is entitled to summary judgment "if the motion and response show that there is no genuine dispute as to any material fact" and that the moving party "is entitled to judgment as a matter of law." Md. Rule 2-501(f). In making this determination, the court must consider the record in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party. *Oglesby v. Baltimore Sch. Assocs.*, 484 Md. at 327. "'[I]f those facts are susceptible to inferences supporting the position of the party opposing summary judgment, then a grant of summary judgment is improper.'" *RDC Melanie Drive, LLC v. Eppard*, 474 Md. 547, 564 (2021) (quoting *Ashton v. Brown*, 399 Md. 70, 79 (1995)).

In her appellate brief, Ms. Moore contends that the record established genuine disputes of material fact concerning whether the defendants had actual or constructive notice of a dangerous condition at the Salisbury CVS store and whether CVS Pharmacy operated or controlled the store. Ms. Moore presents the following two questions:

16

1. Did the circuit court err by granting summary judgment to [CVS Pharmacy] finding that Ms. Moore was not "entitle[d] . . . to have a cause of action against CVS Pharmacy, Inc."?

2. Did the circuit court err by granting [Maryland CVS]'s motion for summary judgment and finding that the Incident was not foreseeable to [Maryland CVS]?

In their appellate brief, Maryland CVS and CVS Pharmacy argue that the summary judgment rulings should be affirmed. They contend the circuit court did not err when it granted summary judgment on the ground that Maryland CVS lacked notice of an unsafe condition at the Salisbury CVS store. They also contend that CVS Pharmacy is entitled to summary judgment on the ground that it does not own or operate the Salisbury CVS store, as well as on the ground of absence of notice.

Because the issue of whether the defendants had actual or constructive knowledge or notice of a dangerous condition potentially affects the claims against both defendants, this opinion will address that issue before it considers whether CVS Pharmacy might be held liable for injuries to invitees at the Salisbury CVS store.

## I.    Knowledge or Notice of Dangerous Condition

In the present action, Ms. Moore raised negligence and premises liability claims against Maryland CVS and CVS Pharmacy. "In a negligence action, a plaintiff bears the burden of proving: '1) that the defendant was under a duty to protect the plaintiff from injury, 2) that the defendant breached that duty, 3) that the plaintiff suffered actual injury or loss, and 4) that the loss or injury proximately resulted from the defendant's breach of that duty.'" *Steamfitters Local Union No. 602 v. Erie Ins. Exch.*, 469 Md. 704, 727 (2020) (quoting *Rowhouses, Inc. v. Smith*, 446 Md. 611, 631 (2016)). Because premises

17

liability is based on principles of negligence, a claim for premises liability requires proof of the same four elements required for any negligence claim. *See Macias v. Summit Mgmt., Inc.*, 243 Md. App. 294, 316 (2019).

The duty owed by the possessor or owner of property to a person injured on the property depends on the status of the injured person at the time of the incident. *See Macias v. Summit Mgmt., Inc.*, 243 Md. App. at 316. "'The highest duty is that owed to an invitee; it is the duty to use reasonable and ordinary care to keep [the] premises safe for the invitee and to protect [the invitee] from injury caused by an unreasonable risk which the invitee, by exercising ordinary care for [the invitee's] own safety will not discover.'" *Davis v. Regency Lane, LLC*, 249 Md. App. 187, 207 (2021) (quoting *Richardson v. Nwadiuko*, 184 Md. App. 481, 489 (2009)) (further citation and quotation marks omitted).

Customers invited to a retail store are entitled to assume that store proprietors will exercise reasonable care to inspect the premises for any unsafe conditions and to protect or warn customers against unsafe conditions. *See Maans v. Giant of Maryland, L.L.C.*, 161 Md. App. 620, 627 (2005). Although "[s]torekeepers are not insurers of their customers' safety," they may be liable if a customer's injury results from a failure to exercise ordinary care. *Giant Food, Inc. v. Mitchell*, 334 Md. 633, 636 (1994). A storekeeper has an obligation to use reasonable care to protect its invitees "'not only against dangers which may arise from some defect or unsafe condition of the physical property . . . but against dangers which may be caused by negligent acts of [the storekeeper's] employees, or even of customers,'" as long as a reasonably prudent person

18

"'should have anticipated the possible occurrence and the probable results of such acts.'" *Id.* at 636-37 (quoting *Eyerly v. Baker*, 168 Md. 599, 607 (1935)).

Here, there is no dispute that Ms. Moore was a business invitee when she suffered injuries inside the Salisbury CVS store. Nor is there any dispute that Maryland CVS leased the store premises from Clairmont Center. When a commercial tenant leases store premises from a landowner, the tenant assumes the "position of owner and occupier of the leased premises" and, therefore, owes a duty of care to persons invited onto the premises. *See Ford v. Edmondson Vill. Shopping Ctr. Holdings, LLC*, 251 Md. App. 335, 349-50 (2021). The customers that a commercial tenant invites to a store "ordinarily occupy the status of business invitees" of that tenant. *Id.* at 350. Accordingly, Maryland CVS owed Ms. Moore a duty "'to exercise ordinary care to keep the premises in a reasonably safe condition'" and would be "'liable for injuries sustained in consequence of a failure to do so.'" *Maans v. Giant of Maryland, L.L.C.*, 161 Md. App. at 627 (quoting *Rawls v. Hochschild, Kohn & Co.*, 207 Md. 113, 117 (1955)).

In general, to prove a negligence claim against a store proprietor, the invitee must show that the proprietor either "'created the dangerous condition or had actual or constructive knowledge of its existence' prior to the invitee's injury." *Maans v. Giant of Maryland, L.L.C.*, 161 Md. App. at 628 (quoting *Lexington Market Auth. v. Zappala*, 233 Md. 444, 446 (1964)). "'It is not necessary that there be proof that the [proprietor] had actual knowledge of the conditions creating the peril; it is enough if it appears that [the proprietor] could have discovered them by the exercise of ordinary care[.]'" *Deering Woods Condo. Ass'n v. Spoon*, 377 Md. 250, 264 (2003) (quoting *Moore v. American*

19

*Stores Co.*, 169 Md. 541, 551 (1936)).  The invitee may prove the requisite knowledge through evidence that the proprietor had "actual or constructive notice" of a dangerous condition on the premises.  *See Macias v. Summit Mgmt., Inc.*, 243 Md. App. at 336.

"[N]otice is usually not an issue" in cases where the store proprietor or its employees "are alleged to have created the dangerous condition."  *Keene v. Arlan's Dep't Store of Baltimore, Inc.*, 35 Md. App. 250, 256 (1977).  The issue of notice "generally arises when the dangerous condition is created by a third party."  *Tennant v. Shoppers Food Warehouse Md. Corp.*, 115 Md. App. 381, 394 (1997).  "Usually, in [those] cases, the plaintiff claims that the defendant has breached its duty to inspect for dangers created by third parties," such as other store patrons.  *Id.*

The store proprietor may be liable for injuries caused by a dangerous condition created by another store patron if it gained actual or constructive knowledge of the condition with "'sufficient time . . . to discover, cure, or clean up'" that condition. *Joseph v. Bozzuto Mgmt. Co.*, 173 Md. App. 305, 347 (2007) (quoting *Rehn v. Westfield America*, 153 Md. App. 586, 593 (2003)).  On the other hand, a restaurant proprietor is not liable for injuries suffered when a customer slips on a beverage spilled by another customer, unless there is evidence that the proprietor had actual or constructive notice of the spill and also had sufficient opportunity to clean it up.  *See Rehn v. Westfield America*, 153 Md. App. at 598.

The present case does not neatly fit into the category of cases in which the issue of notice to a store proprietor usually arises.  Ms. Moore alleges that her injuries resulted from the combination of Ms. Belfort's negligent driving and from the failure, on the part

20

of the owners and operators of the store, to protect invitees from this allegedly foreseeable type of driver error. Ms. Moore claims that the store owners and operators created an unsafe condition by keeping parking spaces directed at the entrance without bollards or other measures to protect against vehicles. Without question, Maryland CVS had sufficient knowledge and notice of the layout of its parking spaces and store entrance, as well as the absence of protective barriers. The relevant focus, therefore, is whether the evidence supports a conclusion that Maryland CVS knew or should have known that the existing layout presented a hazardous condition.

As a preliminary matter, Maryland CVS contests whether Ms. Moore may proceed on a theory that the parking lot was defectively designed. Maryland CVS claims that counsel for Ms. Moore "abandoned" any claim that the "original" design of the parking lot was defective during the hearing on the summary judgment motions. Maryland CVS argues that, in this appeal, Ms. Moore should be bound by this purported "abandonment of her original design defect argument[.]"

The transcript does not support the assertion that Ms. Moore "abandoned" a claim that the parking lot was defectively designed. During the hearing, counsel for Ms. Moore stated that her expert witnesses concluded that the three unreserved parking spaces nearest to the entrance did not "need to be there to begin with." Counsel continued: "But we're not taking issue with the original design. What we're saying is that over time, those spaces could have been removed and, . . . from an [ADA] and a zoning standpoint, would have been perfectly fine." Counsel stated that, "[o]ver time," the CVS defendants should have known that "this particular door required more to protect pedestrians and

21

patrons, based on the plethora of incidents around the country[]" of vehicles crashing into storefronts.

Counsel's comments do not amount to a concession or admission about the design of the parking lot. These comments specified that the focus of the negligence claim was not the "original" design of the parking lot in 2011 but the failure to "remove[]" three spaces near the entrance or to install something else "to protect pedestrians and patrons," at some point before the time of the accident in 2019. Counsel did not abandon a theory of defective design by specifying that the proper time for assessing the foreseeability of the accident was 2019 rather than 2011. Moreover, the circuit court did not find that counsel had "abandoned" the theory that the parking lot design was defective. When explaining its summary judgment ruling, the court accurately described the theory of negligence as follows: "the allegation would be that Maryland CVS has a defective condition in the parking lot by not having appropriate parking, either parking layout, [or] parking structure, . . . by [which] I mean bollard, landscaping, other things that would have prevented this accident from occurring[.]"

The leading authority in Maryland on the scope of a store proprietor's duty to protect customers from injuries caused by third-party motorists is *Dalmo Sales of Wheaton, Inc. v. Steinberg*, 43 Md. App. 659 (1979). The plaintiff in that case, Mrs. Steinberg, suffered grievous injuries when a vehicle struck her while she was walking along a sidewalk in front of an appliance store. *Id.* at 661. The driver had been attempting to jump-start the vehicle in a parking space and carelessly caused it to accelerate forward onto the adjacent sidewalk. *Id.* at 663-64. The vehicle struck Mrs.

Steinberg, pinned her to the base of the storefront, pushed her through a window, and caused part of the broken window to drop onto her legs. *Id.* at 664.

Mrs. Steinberg brought negligence claims against the company that owned the store property (referred to as "Northwestern") and companies that leased and possessed the property (referred to collectively as "Luskins"). *Dalmo Sales of Wheaton, Inc. v. Steinberg*, 43 Md. App. at 661. Mrs. Steinberg alleged that Northwestern and Luskins "maintained the sidewalk and parking lot in a dangerous and defective condition by failing to maintain a curb or other barrier that would prevent the encroachment of the sidewalk by vehicles from the parking lot or otherwise retard or halt vehicular traffic across the sidewalk," and that "they knew or should have known that such deficiencies might create an unreasonable risk to people using the sidewalk[.]" *Id.* After trial, the jury found all defendants liable for the injuries to Mrs. Steinberg. *Id.* The trial court denied Luskins' motion for judgment notwithstanding the verdict but granted Northwestern's motion for judgment notwithstanding the verdict. *Id.* Luskins appealed, and Mrs. Steinberg cross-appealed. *Id.* at 662.

When recounting the pertinent facts, the Court stated: "A critical fact in this case, in terms of whether Luskins or Northwestern have any liability to Mrs. Steinberg, is that there was no barrier, in the form of a curb, wheel blocks, or bollards, to inhibit automobiles parked or being driven on the parking lot from encroaching on the sidewalk." *Dalmo Sales of Wheaton, Inc. v. Steinberg*, 43 Md. App. at 663. The Court explained that "the parking lot sloped up to meet the sidewalk at grade, leaving somewhat of a rut or gully just before the two joined." *Id.* At trial, an expert traffic engineer had

23

testified that, "for at least 25 to 30 years"—i.e. since the late 1940s or early 1950s—"it ha[d] been a 'common and standard practice' to separate parking spaces from pedestrian walkways by the use of curbs, wheel blocks, or bollards." *Id.* at 667. The expert opined that "the property (by reason of the absence of such a barrier) 'was not consistent' with this quarter-century old practice." *Id.* Other evidence indicated that a standard six-inch curb or standard eight-inch wheel block either would have impeded the vehicle or at least would have slowed the vehicle enough for Mrs. Steinberg to avoid it. *Id.* at 667-68 & n.2.

The Court observed: "There was no evidence that, in the 21-year history of the building, anyone on the front sidewalk had ever been injured by reason of an encroaching automobile[.]" *Dalmo Sales of Wheaton, Inc. v. Steinberg*, 43 Md. App. at 666. The Court noted, however, that there was evidence that "encroachment by automobiles had been a problem in the past" in the store parking lot and that "Luskins, through its supervisory employees, had been made aware of the problem." *Id.* Specifically, the keeper of an adjacent store, which faced the same parking lot, notified a Luskins employee of an incident in which a vehicle crashed into a window at the adjacent store. *Id.* The same storekeeper also informed a Luskins employee of an incident in which his vehicle crashed into equipment on the sidewalk in front of Luskins. *Id.* After one incident, a Luskins employee suggested placing poles or bollards in front of the store, but Luskins declined to install any such devices. *Id.* at 667.

On appeal, Luskins acknowledged that it owed a duty of care to Mrs. Steinberg, as a business invitee, but argued that this duty did not extend "to the type of risk or

24

exposure" that caused her injuries. *Dalmo Sales of Wheaton, Inc. v. Steinberg*, 43 Md. App. at 665. The Court framed the central issue as follows: "Given the existing layout of the property, was the possibility that a car might come over the sidewalk and strike a pedestrian who was lawfully thereon a reasonably foreseeable one . . . that Luskins had a duty to anticipate and guard against?" *Id.*

The Court explained that "cases involving a storekeeper's liability for injuries to [its] invitee appear to fall into at least three categories[.]" *Dalmo Sales of Wheaton, Inc. v. Steinberg*, 43 Md. App. at 670. In the first category, "the injury arises from the negligent or deliberate act of a third party committed on the storekeeper's property but does not involve any defect in the property itself." *Id.* The second category involves defects such as hazardous walking surfaces, which are capable "of causing injury directly to [whoever] comes into contact with them, without the need for a concurrent act or omission by anyone else." *Id.* In the third category, the injury "results not solely from the condition itself, or from the injured person's contact with it, but rather from the combination of the condition and the independent action of another person or object." *Id.* at 670-71.

The Court reasoned that Mrs. Steinberg's case "f[ell] squarely within this third category" of cases. *Dalmo Sales of Wheaton, Inc. v. Steinberg*, 43 Md. App. at 671. Specifically, Mrs. Steinberg claimed that her injuries "resulted from the coincidence of [the driver's] negligent operation of [a] vehicle *and* the lack of a barrier sufficient to avert or delay the encroachment of the sidewalk." *Id.* (emphasis in original). To analyze foreseeability in this type of case, the Court wrote, a court must "consider the

25

reasonableness of anticipating the occurrence of harm from the combination and interaction" of "two independent causative factors[,]" "rather than from either alone." *Id.* The Court observed that, where an injury is alleged to result from negligent acts of more than one person, the liability of the first person depends on "'whether the negligent act of the other was one which [a person] of ordinary experience and sagacity, acquainted with all the circumstances, could reasonably anticipate or not.'" *Id.* (quoting *State v. Hecht Co.*, 165 Md. 415, 422 (1933)).

Luskins contended that the "runaway car" that injured Mrs. Steinberg was not foreseeable because it resulted from a "'freakish'" series of events. *Dalmo Sales of Wheaton, Inc. v. Steinberg*, 43 Md. App. at 672. The Court agreed that it would "require a wide, loose, and vivid imagination to predict or foresee the strange combination of circumstances that actually led" to Mrs. Steinberg's injuries. *Id.* The Court explained, however, that "it is not the 'freakish' chain of circumstances that actually occurred . . . that must be reasonably foreseeable, but rather the more general class of harm that might occur to invitees walking upon the sidewalk from the movement of encroaching vehicles." *Id.* at 673. The Court stated that this type of "harm could result from a variety of forms of negligent driving from failing to stop in time while attempting to park, to placing the car in the wrong gear while attempting to leave, and much in between." *Id.* at 673-74.

Surveying out-of-state cases concerning a storekeeper's liability for injuries caused by vehicles, the Court compared Mrs. Steinberg's case to those in which courts "concluded that the issues of negligence, foreseeability, and proximate cause" were

"properly for a jury to determine." *Dalmo Sales of Wheaton, Inc. v. Steinberg*, 43 Md. App. at 674. The Court observed that the evidence showed "not only the absence of any barrier (other than the gully) between the lot and the adjacent sidewalk," but also indicated that "even a standard and common curb, bollard, or wheel block" would have prevented the injury. *Id.* at 675. The Court adopted the following analysis, from an opinion upholding the liability of a restaurant owner where a vehicle crashed through a wooden barrier and injured a customer standing in a waiting area outside the restaurant:

> "Reasonable men could believe it was necessary to have a barrier separating the waiting customers from those approaching, parking and leaving in vehicles. Reasonable men could believe that the barrier provided was inadequate. Reasonable men could believe that the possibility of a car jumping, lurching, or bolting forward because of mechanical failure, or negligence of the driver, although remote, was foreseeable, and that in balancing this possibility against the risk of harm to patrons . . . it would have been no inordinate burden on the owners or operators, or to the patrons, to have installed a more substantial barrier protecting that particular area of the premises."

*Id.* at 675-76 (quoting *Barker v. Wah Low*, 97 Cal. Rptr. 85, 92 (Dist. Ct. App. 1971)).

The Court recognized that a storekeeper has no obligation "to erect an impenetrable wall around [the] building or to protect [store] patrons from every manner or form of harm[.]" *Dalmo Sales of Wheaton, Inc. v. Steinberg*, 43 Md. App. at 675. The Court "conclude[d] only that where there is evidence to establish, or fairly to support the inference, that the injury arose at least in part from an unsafe condition in the storekeeper's property, and that, as to the storekeeper, the *class of harm* that occurred was *reasonably* foreseeable *and could reasonably have been prevented or guarded against*, the issues of proximate cause and foreseeability are for the trier of fact to

27

determine[.]" *Id.* (emphasis in original). Applying that standard, the Court determined that Luskins was not entitled to judgment in its favor as a matter of law. *Id.* The Court determined that the evidence was sufficient to conclude "that the condition of the property was unsafe, that the defect constituted a concurrent proximate cause of Mrs. Steinberg's injuries, and that, as to Luskins, the occurrence and the harm resulting from it were reasonably foreseeable." *Id.* at 681.

The Court went on to hold that the evidence was also sufficient to prove the liability of the property owner, Northwestern. *Dalmo Sales of Wheaton, Inc. v. Steinberg*, 43 Md. App. at 681-87. As the lessor of the property, Northwestern could be subject to liability if it leased the property for a purpose that involved the admission of the public and if the unsafe condition of the property existed at the time that it leased the property. *Id.* at 681-82. The Court reasoned that, at the time of the lease, Northwestern knew or should have known that "the parking lot would meet the sidewalk essentially at grade level, without benefit of a curb[,]" and that the condition of the property "would not likely be changed before the public was admitted to the property." *Id.* at 684-85. Accordingly, the "key question" was whether there was sufficient evidence that Northwestern "knew, or, by the exercise of reasonable care, could have discovered, that the condition was a dangerous one that . . . involved an unreasonable risk of harm to business invitees who would lawfully be coming onto the property and using the sidewalk[.]" *Id.* at 685.

The Court stated: "There was no evidence that Northwestern was aware, at any time prior to the Steinberg accident, of any problem of automobile encroachments at this

28

or any other property owned by it." *Dalmo Sales of Wheaton, Inc. v. Steinberg*, 43 Md. App. at 685. Specifically, the Court recognized that no one ever notified Northwestern of any incidents of vehicles encroaching onto the sidewalk in the parking lot. *Id.* The Court stated that the "only evidence . . . in the record dealing with what Northwestern knew or should have known" was certain testimony from an expert traffic engineer called by Mrs. Steinberg. *Id.* The expert testified that "the 'standard practice' of separating sidewalks from adjacent parking lots by curbing, wheel blocks, or bollards" had existed for at least 25 or 30 years and was "'so fundamental'" by the 1970s that more recent texts would not even discuss the subject. *Id.*

The Court reasoned that, "if the practice of so separating sidewalks from adjacent lots was standard or fundamental 30 years" before 1979, this practice "was something that Northwestern, an experienced real estate investor, should have known about when it purchased the property in 1953." *Dalmo Sales of Wheaton, Inc. v. Steinberg*, 43 Md. App. at 686 (footnote omitted). The Court reasoned further that, "if Northwestern is chargeable with knowledge of that standard practice, . . . it may also be chargeable with knowing that a failure to comply with the standard might create a dangerous condition from which injury could arise." *Id*. Thus, even without evidence that Northwestern had "direct knowledge" of any incidents of vehicles encroaching from the parking lot, knowledge of the "common and fundamental" practice of "designing parking lots so as to avoid encroachment of adjacent sidewalks" could "be imputed to a sophisticated commercial real estate investor such as Northwestern." *Id.* at 687. Accordingly, Northwestern was not entitled to judgment in its favor as a matter of law. *Id.*

In this appeal, Ms. Moore argues that her claims are "factually analogous" to the claims in *Dalmo*. Ms. Moore argues that the circuit court erroneously decided that the incident at the Salisbury CVS store was unforeseeable solely because "there were no prior accidents to put the store owner on notice" of the unsafe condition. Ms. Moore argues that "the correct inquiry under *Dalmo* is whether the harm fell within the 'general field of danger' that should have been anticipated." Ms. Moore further argues that the court "ignored" the testimony of her expert witnesses about "customary engineering and storefront safety standards[.]" In particular, Ms. Moore cites deposition testimony from her expert engineer, Mr. Boyd, who opined that installing parking spaces directly facing the storefront entrance was inconsistent with standard engineering principles and created an unsafe condition for customers.

In response, Maryland CVS contends that the present case is "readily distinguishable" from *Dalmo*. Maryland CVS characterizes *Dalmo* as an opinion that addresses the "necessity of proving both a dangerous condition and notice" of a dangerous condition. Maryland CVS highlights the *Dalmo* Court's statement that a "critical fact" in establishing the liability of Luskins was the absence of any "barrier, in the form of a curb, wheel blocks, or bollards," to inhibit vehicles from encroaching onto the sidewalk. *Dalmo Sales of Wheaton, Inc. v. Steinberg*, 43 Md. App. at 663. Maryland CVS repeatedly notes that, in the present case, the parking space at issue had at least a wheel stop in front of it.

In our assessment, it is unreasonable to interpret *Dalmo* to mean that any barrier of any kind, no matter how ineffective, automatically precludes liability against a store

30

proprietor for storefront vehicle accidents. Under the facts of *Dalmo*, the absence of any wheel block was especially significant, because the evidence indicated that a standard wheel block would have prevented that particular accident, in which a parked vehicle suddenly accelerated forward. The expert testimony "either indicated directly, or allowed a permissible inference, that the vehicle would not have mounted and overrun either a six-inch curb or standard-sized wheel blocks, and that, if it did manage to get over such obstacles, it would have been sufficiently delayed in its forward motion to have allowed Mrs. Steinberg to reach the relative safety of the entranceway." *Dalmo Sales of Wheaton, Inc. v. Steinberg*, 43 Md. App. at 668.

The *Dalmo* opinion expressly described the "gully" between the parking lot and the sidewalk as a "barrier" of some sort, when the Court mentioned "the absence of any barrier (*other than the gully*) between the lot and the adjacent sidewalk[.]" *Dalmo Sales of Wheaton, Inc. v. Steinberg*, 43 Md. App. at 675 (emphasis added). The Court adopted the reasoning of an opinion upholding the liability of a restaurant owner even though there was a wooden barrier between parking spaces and the outdoor waiting area where the customer was injured. *Id.* at 675-76. The Court quoted the statements that a factfinder could reasonably conclude that "'it was necessary to have a barrier separating the waiting customers from those approaching, parking and leaving in vehicles[,]'" that "'the barrier provided was inadequate[,]'" and that it would not be an inordinate burden to install "'a more substantial barrier protecting that particular area of the premises.'" *Id.* at 676 (quoting *Barker v. Wah Low*, 97 Cal. Rptr. at 721). By doing so, the Court unmistakably recognized that, in appropriate cases, the jury may need to decide whether a

31

barrier provided by a proprietor was adequate and substantial enough to protect invitees from a class of harm found to be reasonably foreseeable.

In the present case, no evidence indicated that a wheel stop in the parking spaces in front of the Salisbury CVS store could have impeded a moving vehicle. The only evidence about the effect of wheel stops came from the experts designated by Ms. Moore. At his deposition, Mr. Boyd, an engineering expert, testified that a wheel stop is not "intended to stop a moving car" and "is meant as a notification" to the driver "to not pull any further" into a parking space. By contrast, Mr. Boyd stated that bollards and certain landscaping or architectural features may be adequate to protect a storefront from vehicles. Similarly, Mr. Reiter, an expert safety consultant, stated that there is a consensus that wheel stops are "not vehicle-stopping barriers[.]" Mr. Reiter testified that "bollards are used to keep a vehicle from driving through the end of the parking space and into pedestrian-only areas." The evidence here did not compel a finding that a wheel stop was adequate to protect against the risk that a driver might fail to stop while attempting to park a vehicle.

Maryland CVS argues that the present case is unlike *Dalmo* because the store proprietor in that case received reports of "multiple prior incidents of vehicles encroaching on sidewalks" in the same parking lot. In our assessment, it would be an error to interpret *Dalmo* to mean that store proprietors have no obligation to take protective measures against encroaching vehicles unless and until they receive reports of incidents at their stores or stores under their control. The central inquiry is whether the evidence supports an inference that the injury "arose at least in part from an unsafe

32

condition" at the store and that "the class of harm that occurred was reasonably foreseeable" to the store proprietor and "could reasonably have been prevented or guarded against" by the proprietor. *Dalmo Sales of Wheaton, Inc. v. Steinberg*, 43 Md. App. at 676 (emphasis omitted). This formulation does not suggest that a store proprietor avoids liability for reasonably foreseeable accidents as long as the accident is the first one reported to that proprietor.

To the contrary, the *Dalmo* opinion specifically upheld the liability of one defendant even though that defendant lacked actual notice or knowledge of any incidents of vehicle encroachment at the store. The Court concluded that, even though the property owner, Northwestern, lacked knowledge of those incidents, other evidence supported an inference that Northwestern knew or should have known about the dangerous condition in the parking lot. *Dalmo Sales of Wheaton, Inc. v. Steinberg*, 43 Md. App. at 686-87. The Court reasoned that certain testimony from an expert traffic engineer constituted "evidence" of "what Northwestern knew or should have known in this regard[.]" *Id.* at 685. The expert had testified that "the 'standard practice' of separating sidewalks from adjacent parking lots by curbing, wheel blocks, or bollard extended" back at least 25 years and that the practice was "'so fundamental'" that recent texts do not even mention that practice. *Id.* This testimony supported reasonable inferences that Northwestern should have known about that standard before it leased the property and should have known that a failure to comply with that standard would create a dangerous condition. *Id.* at 686.

In the present case, the record included expert testimony similar to the testimony

33

that supported an inference of constructive knowledge in *Dalmo*. At his deposition, John Boyd, an expert civil and environmental engineer, explained that he has personal experience designing retail stores and parking lots, including a CVS store and a Walgreens store in other states. Mr. Boyd referred to texts issued by the Institution of Transportation Engineers, which, he said, emphasize the importance of "ensuring that pedestrian-vehicular conflicts at entry and exits to buildings are minimized." According to Mr. Boyd, "pedestrian and vehicular conflict is one of the utmost important things that has to be designed out of an engineering design." In Mr. Boyd's opinion, "[t]he entire point of engineering design" in this field "is to reduce" or "eliminate [that] conflict as part of your design[.]"

Mr. Boyd concluded that the design of the Salisbury CVS store violated the standard of care for the engineering design of a commercial property. Mr. Boyd stated that CVS stores and other pharmacy stores are "high-intense use" businesses, with "significantly more patrons" and "significantly more cars" than other types of businesses. Because CVS stores provide "one singular entrance" for all customers entering and exiting the store, Mr. Boyd stated the entrance is "a high-risk area" for "[p]edestrian and vehicular conflict." Mr. Boyd opined that the Salisbury CVS store had "an odd layout not consistent with typical engineering standards[.]" Specifically, Mr. Boyd opined that the three unreserved parking spaces near the entrance were "pointed directly head-in at the front of the store with no protection" at a "significantly high pedestrian area with a high risk of conflict." Mr. Boyd concluded that those spaces were "put in a location" that

34

was "not consistent with typical engineering design" and that "created [a] hazard."[3]

Throughout this case, Maryland CVS has disputed the premise that the parking space at issue here was pointed directly at the entrance doors. When deposing Mr. Boyd, counsel for Maryland CVS asserted that the parking space through which Ms. Belfort drove her vehicle was, in fact, pointed at one of the accessible, ADA-compliant parking spaces rather than the entrance itself. Mr. Boyd agreed that the parking space identified by counsel was "perpendicular to" an accessible parking space. Mr. Boyd stated, however, that a vehicle would be "pointed directly at the front of the store" while making a right-hand turn to pull into that spot. Mr. Boyd stated that, "as part of th[e] turning movement," a vehicle "could be directed into th[e] conflict area with a driving mistake." Mr. Boyd opined that arranging a parking space perpendicular to an accessible parking space is "inconsistent with standard engineering design," and that a parking space "typically would not be installed th[at] way in a properly engineered parking lot[,]" because the arrangement "creates a secondary hazard and conflict[.]"[4]

---

[3] Mr. Boyd noted that other CVS stores in Maryland are "designed differently" from the Salisbury CVS store, in that those stores "do not allow head-in parking faced directly at the front doors," and "they have protection" in the form of landscaping features or bollards.

[4] Ms. Moore also designated a second expert, Mr. Reiter, to testify about standards for the use of protective devices at retail businesses with parking lots. At his deposition, Mr. Reiter stated that he based his opinions in part on publications from federal agencies and insurance industry entities concerning "pedal error accidents" and "information from various commercial property entities or retail entities or restaurant entities" about the risks associated with head-in parking spaces. Mr. Reiter testified that "pedal error accidents" occur most frequently at "parking spaces that are pointed at the front door or near the front door because those are the areas . . . where parking is done the most" and because "pedestrians are most concentrated" in those areas. Mr. Reiter opined that the

35

A factfinder would be entitled to credit the expert testimony establishing that, at the time of the crash at the Salisbury CVS store, it was a standard practice to avoid placing or keeping head-in parking spaces directed at store entrances used by pedestrians at a high frequency without installing a bollard or other vehicle-stopping barrier. As the owner and operator of pharmacy stores throughout this State, Maryland CVS is an entity at least as sophisticated as the real estate investor from *Dalmo*. Accordingly, one could reasonably conclude that Maryland CVS knew or should have known about the standards described by Mr. Boyd and about dangers that might arise from failing to comply with those standards. Knowledge of standards "as common and fundamental" as Mr. Boyd described "could well be imputed to" Maryland CVS. *Dalmo Sales of Wheaton, Inc. v. Steinberg*, 43 Md. App. at 687. "The imputation is by inference, of course, but it is an inference fairly arising from" the testimony. *Id.*

In addition to its attempts to distinguish *Dalmo*, Maryland CVS proposes an exceptionally narrow view of what might constitute admissible evidence that it had actual or constructive notice of a dangerous condition. Maryland CVS theorizes that the circuit court narrowed the scope of admissible evidence of notice at the discovery motions hearing on September 14, 2023.

During that hearing, the court partially granted Ms. Moore's motion to compel

---

three unreserved parking spaces near the entrance to the Salisbury CVS store were "at risk" and that the entrance "should have been protected" by bollards or other measures such as landscaping features. Mr. Reiter opined that the entrance was "subject to vehicle incursion from those three spaces[,]" even though those spaces are pointed toward the entrance "at an angle."

Maryland CVS to respond to certain interrogatories. Maryland CVS argued that it did not "have access to all of the data or information" requested in the interrogatories because various "independent entities" own individual CVS stores throughout the country. In response to questions about what information Maryland CVS could provide, counsel mentioned that "this particular CVS" was part of a geographical "district" with several other stores. The court ordered Maryland CVS to disclose any incidents within five years of the accident of a vehicle driving into a stand-alone store with parking around it, located in the same geographical district. The court also compelled Maryland CVS to disclose whether a stand-alone store in the same district had ever been advised by government authorities to install safety devices around the store to protect against vehicles.

Maryland CVS characterizes the circuit court's discovery ruling as a "ruling on the scope of notice." Maryland CVS asserts that this ruling "determined the relevant scope of notice geographically and as to time frame and store type." According to Maryland CVS, evidence of any incidents outside the scope of the ruling would be "inadmissible" as evidence of actual or constructive notice of a dangerous condition. Maryland CVS argues that, because Ms. Moore has not challenged that discovery ruling on appeal, she has waived any argument about the scope of that ruling.

Maryland CVS's interpretation of the circuit court's discovery ruling lacks merit. When partially granting the discovery motion, the court decided a narrow issue of whether it should compel Maryland CVS, over its objection, to answer certain numbered interrogatories. The court's ruling was informed by practical concerns about whether

Maryland CVS possessed or had the ability to obtain the information sought without undue burden. The court did not decide, nor was it required to decide, questions about the admissibility of evidence or the legal sufficiency of evidence. Moreover, the circuit court did not decide any discovery matters related to CVS Pharmacy, whose refusal to respond to discovery requests became the subject of a later, unresolved motion to compel. The discovery order does not limit the evidence that might tend to prove that the class of harm that occurred here was reasonably foreseeable to one or more defendants.

We conclude that Maryland CVS, much like the defendants in *Dalmo*, was not entitled to judgment in its favor as a matter of law. Maryland CVS was not entitled to summary judgment merely because the parking space had a wheel stop—something which, by all accounts, would not impede a moving vehicle. Maryland CVS was not entitled to summary judgment merely because there were no prior vehicle crashes at the same store or at certain nearby CVS stores. The evidence in the record was sufficient to allow a reasonable jury to conclude that Maryland CVS knew, or by the exercise of reasonable care, could have discovered that the arrangement of the parking spaces and entrance of the Salisbury CVS store presented an unreasonable risk of harm to invitees using the entrance.

Although Ms. Moore is not required to prove that Maryland CVS had prior notice of similar incidents, evidence of other incidents may still be probative of whether the class of harm that occurred was reasonably foreseeable to one or more defendants. Ms. Moore contends that, because CVS Pharmacy acted as an agent of Maryland CVS Pharmacy in various functions, any knowledge of CVS Pharmacy concerning vehicle

38

crashes should be imputed to Maryland CVS. Citing an expert report from Mr. Reiter, Ms. Moore asserts that CVS Pharmacy had an extensive history of crashes—more than 100 incidents of vehicles crashing into CVS stores around the United States between 2011 and the time of the accident. Maryland CVS disputes the admissibility of Mr. Reiter's report, arguing that "a self-serving report being offered by the party who prepared it . . . would not be admissible at trial." *Kelly v. Baltimore County*, 161 Md. App. 128, 150 (2005). In addition to the report, however, Mr. Reiter also gave deposition testimony about the history of storefront accidents at CVS stores across the country, citing his research of publicly available information.[5]

The summary judgment record is inadequate for this Court to decide the potential admissibility of evidence about prior vehicle crashes at other CVS stores or to address whether the purported knowledge of CVS Pharmacy concerning other incidents might be imputed to Maryland CVS. On remand, if Ms. Moore offers evidence about prior incidents at CVS stores, the circuit court should rule on any objections in accordance with the rules of evidence. As discussed previously, the discovery ruling from September 14, 2023, is not a basis to exclude evidence that might tend to prove that the class of harm that occurred was reasonably foreseeable to a defendant.

---

[5] Mr. Reiter testified that he compiled his database of incidents about storefront crashes using "a mix of media reports, information gained as a result of litigation, police reports," and "some academic studies[.]" Generally, "if the facts and data that an expert relies on are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject,' they need not be independently admissible at trial." *Levitas v. Christian*, 454 Md. 233, 246 (2017) (quoting Md. Rule 5-703(a)).

## II. Evidence of Ownership or Control by CVS Pharmacy

Although there is no dispute that Maryland CVS owed a duty of reasonable care to Ms. Moore, CVS Pharmacy contends that it owed no duty to any invitees of the Salisbury CVS store. CVS Pharmacy moved for summary judgment based on the assertion that it does not own or operate the Salisbury CVS store. CVS Pharmacy asserted that it was merely the parent company of Maryland CVS, the entity that leases the store premises and directly operates the Salisbury CVS store. The circuit court granted summary judgment in favor of CVS Pharmacy, stating that "there was sufficient evidence in the record as it relates to [Maryland CVS] being on the lease, having sufficient control, and exercising that control over the property[.]" In other words, the court was persuaded by CVS Pharmacy's argument that Maryland CVS was the sole operator of the store.

On appeal, Ms. Moore contends that the circuit court applied an incorrect standard and failed to consider whether there were genuine disputes of material fact. Ms. Moore argues that the court "ignored factual disputes concerning [CVS Pharmacy's] management and control of the store" and "the agency agreement" between Maryland CVS and CVS Pharmacy. Ms. Moore also argues that, despite CVS Pharmacy's refusal to answer any discovery requests, she still produced evidence "regarding [CVS Pharmacy's] control of the subject store, as manager and not owner[.]" Ms. Moore cites the deposition testimony in which Mr. Pawlewicz, an employee of CVS Pharmacy, stated that CVS Pharmacy operates and manages the Salisbury CVS store and described various aspects of its control over individual stores. Ms. Moore asserts that the affidavit from Mr. Moffatt confirms that Maryland CVS "delegates its store-related administrative and

40

management duties" to CVS Pharmacy through an agency agreement. Ms. Moore quotes an affidavit submitted by Mr. Moffatt in a different case, in which he stated that "CVS Pharmacy, Inc.'s operations consist mainly of controlling and managing individual CVS pharmacies and retail stores."

As mentioned previously, the summary judgment standard requires a court to consider the record in the light most favorable to the non-moving party and to construe all reasonable inferences that may be drawn from the facts against the moving party. *See, e.g.*, *Adventist Healthcare, Inc. v. Behram*, 488 Md. 410, 431-32 (2024). The court's role "is not to resolve factual disputes but merely to determine whether those disputes 'exist and are sufficiently material to be tried.'" *Id.* at 432 (quoting *Gambrill v. Bd. of Educ. of Dorchester County*, 481 Md. 274, 297 (2022)). Considered in the light most favorable to Ms. Moore, the evidence adequately supported the conclusion that CVS Pharmacy operates, manages, or controls the Salisbury CVS store.

At his deposition, Mr. Pawlewicz referred to his employer as "CVS Health," which he understood to be another name for "CVS Pharmacy, Incorporated[.]" Mr. Pawlewicz admitted that he was unsure whether CVS Health and CVS Pharmacy were separate entities. In any event, all parties agree that Mr. Pawlewicz was, in fact, an employee of CVS Pharmacy. Mr. Pawlewicz testified based on his experiences as a district leader for CVS Pharmacy, overseeing the Salisbury CVS store and other CVS stores in Maryland and Delaware. Mr. Pawlewicz summarized his oversight duties as "ensur[ing] the operation of the building [and] that it is staffed and it is meeting CVS core expectations[.]"

41

Mr. Pawlewicz testified, to the best of his knowledge, that his employer "operates and manages" the Salisbury CVS store and the other CVS stores that he oversees. Counsel for Ms. Moore inquired at length about different aspects of CVS Pharmacy's operation and management of CVS stores. Among other things, Mr. Pawlewicz stated the policies of CVS Pharmacy require store managers to report incidents involving "any injury" to "anybody on the premises of CVS" or involving "damage to the building." Mr. Pawlewicz also stated that store managers use a centralized "service channel database" to report "any repairs that need to be done to a building." This service channel database "covers a broad variety of things[,]" including "[l]ighting, plumbing, electricity, . . . carpeting[,]" and "[j]ust anything inside and outside th[e] four walls that are not functioning properly." According to Mr. Pawlewicz, vendors for repairs or maintenance submit invoices directly to his employer's "facilities department" rather than to individual CVS stores.

CVS Pharmacy has failed to identify any basis for the court, when deciding a summary judgment motion, to disregard Mr. Pawlewicz's testimony describing CVS Pharmacy's operation and management of individual CVS stores. In its appellate brief, CVS Pharmacy offers an only indirect response to the argument that this testimony generates a genuine dispute of material fact. CVS Pharmacy notes that Mr. Pawlewicz was "not offered as a designee" for CVS Pharmacy, that he testified "over objection" about many deposition topics, and that he "testified 'to the best of [his] knowledge' only." CVS Pharmacy vigorously disputes Mr. Pawlewicz's testimony that CVS Pharmacy *owns* the Salisbury CVS store. CVS Pharmacy notes that Mr. Pawlewicz

42

clarified that he lacked "personal knowledge as to who the owner of the Salisbury store is" and that "he 'just assume[d]'" that the stores that he oversees were "'corporately owned stores[.]'"

Although Mr. Pawlewicz stated that he lacked knowledge about the ownership of the Salisbury CVS store, he did not state that he lacked knowledge about his employer's operation and management of CVS stores. As we understand Ms. Moore's argument, she is no longer claiming that CVS Pharmacy directly owns the Salisbury CVS store. Instead, she is proceeding on a theory that CVS Pharmacy operates and manages the Salisbury CVS store under an agency agreement in which Maryland CVS delegated managerial control to CVS Pharmacy. The existence of that agency relationship is undisputed. The affidavit from Mr. Moffatt, a vice president of CVS Pharmacy and president of Maryland CVS, affirms that CVS Pharmacy performs certain administrative and management functions under an agency agreement with Maryland CVS.

CVS Pharmacy contends that the evidence failed to establish that this agency relationship extends to the design or maintenance of the parking lot. We disagree. Mr. Pawlewicz's testimony indicated that the control that CVS Pharmacy exercises over individual CVS stores includes, at a minimum, decisions about repairs and maintenance of physical structures and facilities inside and outside the store. It would be incongruous to conclude that the entity responsible for approving and paying for repairs and maintenance at the store lacks control over decisions such as whether to install bollards or other devices in front of parking spaces. Construing the testimony in the light most favorable to Ms. Moore, a factfinder could conclude that CVS Pharmacy, rather than

43

Maryland CVS, controls any decisions about the use of protective devices at the store entrance.

In arguing that the evidence conclusively shows that CVS Pharmacy does not operate or manage the Salisbury CVS store, CVS Pharmacy largely relies on the affidavit from Mr. Moffatt. Mr. Moffatt wrote that CVS stores in Maryland "are directly owned and operated by" Maryland CVS. Mr. Moffatt stated that Maryland CVS "operates its respective stores, maintains its own profits and losses, . . . owns and/or leases its own buildings[,] . . . hires and employs its own non-pharmacist employees[,]" and "pays its own employees[.]" Mr. Moffatt also stated that Maryland CVS "outsources its field management, human resources, payroll, and other administrative services." According to Mr. Moffatt, Maryland CVS "entered into an agency agreement" with CVS Pharmacy, "so that [CVS Pharmacy] could provide certain services" to Maryland CVS and "act on its behalf in things like field management, human resources, payroll processing, tax compliance and processing, and other similar administrative and management functions." Mr. Moffatt also stated that, under this agency agreement, Maryland CVS pays for any expenses related to those services.

CVS Pharmacy argues that Mr. Moffatt's affidavit "makes clear that the agency relationship extends *only* to certain administrative tasks." (Emphasis added.) By its own terms, however, the affidavit does not purport to give an exhaustive account of the terms of the agency agreement. The affidavit states that the agreement encompasses "certain services" and "things like field management, human resources, payroll processing, tax compliance and processing, and other similar administrative and management functions."

44

This wording does not specify whether those categories are exclusive, nor does it specify which types of decisions might fall within those broadly-worded categories. The affidavit does not address whether CVS Pharmacy controls matters such as the use of protective devices between the parking lot and the entrance. Moreover, the testimony of Mr. Pawlewicz suggests that the scope of CVS Pharmacy's control goes beyond "administrative tasks," such as processing paychecks, to include matters such as maintenance and repairs.

One of the final paragraphs of Mr. Moffatt's affidavit included a broad assertion that Maryland CVS does not "directly own, lease, control, or operate" the Salisbury CVS store or other CVS stores in Maryland. This assertion, in the context of his other statements about the agency agreement, necessarily involves a legal conclusion about the scope of the agency agreement. CVS Pharmacy did not, however, produce the agreement itself to provide the factual basis for that legal conclusion.

Generally, "a moving party may not rely on unsupported conclusory statements to justify the grant of summary judgment." *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 308 (2007). In the *Hill* case, the Court reversed the grant of summary judgment in favor of a real estate closing agency that had brought an unjust enrichment claim to recover certain funds. One material issue was whether the agency paid those funds to a title insurer under legal compulsion. *Id.* at 305-06. Moving for summary judgment, the agency relied on an affidavit stating that an underwriting agreement required the agency to make that payment. *Id.* at 306.

The Court explained that the "wholly legal conclusions, explicit and implicit,

45

contained in [the] affidavit regarding the asserted legal effect of the alleged underwriting agreement [we]re neither facts nor would they be admissible in evidence[.]" *Hill v. Cross Country Settlements, LLC*, 402 Md. at 306. If the real estate closing agency "desired to rely on the legal conclusion" that the underwriting agreement required the agency to make the payment, the agency "was required to produce the underwriting agreement or, at a minimum, recite the relevant operative terms." *Id.* at 307-08. The Court reversed the grant of summary judgment to the extent that it was based on "an unsupported conclusion regarding the interpretation and/or legal effect of the absent underwriting agreement[.]" *Id.* at 308.

Under the principle applied in *Hill*, the conclusory statements in Mr. Moffatt's affidavit, asserting that CVS Pharmacy does not operate or control the Salisbury CVS store, do not justify the grant of summary judgment. To the extent that CVS Pharmacy's motion rested on a legal conclusion about the scope of the agency agreement, it was inadequate to assert that conclusion by affidavit without producing the factual basis for that conclusion. *See Hill v. Cross Country Settlements, LLC*, 402 Md. at 306-07.

As it did in the circuit court, CVS Pharmacy maintains that the claims against it are an improper attempt to hold a parent company liable for the alleged negligence of its subsidiary. In support of that contention, CVS Pharmacy cites *Dixon v. Process Corp.*, 38 Md. App. 644 (1978). When the circuit court granted CVS Pharmacy's motion, the court stated that it believed that the *Dixon* case was "on point."

Under the facts of that case, a creditor had obtained confessed judgments against a parent corporation that had defaulted on promissory notes. *Dixon v. Process Corp.*, 38

46

Md. App. at 649. The creditor mistakenly believed that the parent corporation owned certain real property, but the creditor later discovered that a subsidiary corporation held title to the property. *Id.* at 650. The creditor brought suit for a decree that would disregard the separate identities of the parent corporation and the subsidiary corporation and allow the creditor to collect the judgment debt using the real property owned by the subsidiary corporation. *Id.*

At trial, much of the evidence "cast doubt as to the separate corporate identities" of the parent corporation and its subsidiary corporation. *Dixon v. Process Corp.*, 38 Md. App. at 654. The parent corporation "conducted the management affairs of all its subsidiaries, owned the equipment they used, hired their employees, paid their office rents, and operated the payrolls and unemployment matters." *Id.* at 647. Despite this evidence, this Court upheld the decision to deny the creditor's claim. *Id.* at 655. This Court recognized that, under Maryland law, "'the corporate entity will be disregarded only when necessary to prevent fraud or to enforce a paramount equity.'" *Id.* at 654 (quoting *Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.*, 275 Md. 295, 312 (1975)). The Court concluded that, under the facts presented, the trial court was not clearly erroneous when it found no fraud and no paramount equity that might justify disregarding the separate identities of the corporations. *Dixon v. Process Corp.*, 38 Md. App. at 655.

In this appeal, Ms. Moore argues that *Dixon* is inapposite because her claim against CVS Pharmacy has "nothing to do with piercing the corporate veil" of Maryland CVS. Ms. Moore observes that the *Dixon* case "did not involve an agency agreement between the two entities." Ms. Moore argues that she is seeking to hold CVS Pharmacy

47

liable for its own actions "as the operator and manager of the store," in its role as an agent of Maryland CVS. Ms. Moore contends that, if CVS Pharmacy operated, managed, and controlled the Salisbury CVS store, acting as an agent, then CVS Pharmacy owed her a duty of reasonable care.

CVS Pharmacy asserts that, because Ms. Moore has disavowed any reliance on a corporate veil-piercing theory, her claim against CVS Pharmacy "depends exclusively on an agency theory of liability[.]" CVS Pharmacy nevertheless contends that Ms. Moore cannot pursue that theory because she did not allege the agency relationship in her pleadings. CVS Pharmacy argues that, in order to seek liability that entails an agency relationship, Ms. Moore would need to amend her complaint to allege that agency relationship. CVS Pharmacy further argues that any such amendment would be barred by the statute of limitations because it would introduce a new cause of action.

CVS Pharmacy cites no authority for the proposition that, when a theory of tort liability entails an agency relationship between two defendants, the pleadings must expressly allege the existence of that agency relationship. Rather, CVS Pharmacy invokes general pleading principles. Under Maryland's "liberal rules of pleading, a plaintiff need only state such facts in his or her complaint as are necessary to show an entitlement to relief." *Johns Hopkins Hosp. v. Pepper*, 346 Md. 679, 698 (1997) (citing Md. Rule 2-303(b)). "Accordingly, a plaintiff must state the issue between the parties with reasonable accuracy so that . . . the defendant may be put on notice of the nature of the complaint that [the defendant] is required to answer and defend." *B & P Enters. v. Overland Equip. Co.*, 133 Md. App. 583, 621 (2000) (citing *Fletcher v. Havre de Grace*

48

*Fireworks Co.*, 229 Md. 196, 200 (1962)).

As amended, the complaint here expressly alleged that both CVS Pharmacy and Maryland CVS "owned, operated, maintained, and managed" the store premises. The amended complaint also alleged that both CVS Pharmacy and Maryland CVS "retained exclusive ownership, possession, control, and/or supervision" of the premises. Under any fair reading, the pleadings were sufficient to communicate an allegation that CVS Pharmacy operated, managed, or controlled the Salisbury CVS store. Adding language to specify that CVS Pharmacy acted in its capacity as agent for defendant Maryland CVS would not introduce an entirely new claim. "'[S]o long as the operative factual situation' remains 'essentially the same,' a 'new cause of action' is not introduced by an amendment which merely sets forth 'a new theory' or invokes 'different legal principles.'" *Youmans v. Douron, Inc.*, 211 Md. App. 274, 291 (2013) (quoting *Crowe v. Houseworth*, 272 Md. 481, 485-86 (1974)).

In *Asphalt & Concrete Services, Inc. v. Perry*, 221 Md. App. 235 (2015), this Court held that an amended complaint that articulated a new theory of liability based on an alleged agency relationship between two defendants did not introduce a new cause of action. In that case, a pedestrian injured by a dump truck brought negligence claims against the driver, a limited liability company that allegedly employed the driver, and a corporation that allegedly hired the limited liability company. *Id.* at 241-42. After discovery showed that the limited liability company was a "forfeited" entity and simply "a trade name" used by the driver, the trial court permitted the plaintiff to amend the complaint to allege that the corporation employed the driver as its agent and that the

49

driver was subject to the corporation's control and direction.  *Id.* at 243-44.  This Court concluded that this amendment "did not change the operative fact pattern or state a new cause of action" but "merely reflected" the information produced during discovery.  *Id.* at 269.  This Court held, therefore, that the amendment related back to the timely original complaint.  *Id.* at 270.

In light of *Asphalt & Concrete Services, Inc. v. Perry*, 221 Md. App. at 268-70, CVS Pharmacy is incorrect in arguing that the statute of limitations bars Ms. Moore from pursuing her claim that CVS Pharmacy operated and managed the Salisbury CVS store as an agent of Maryland CVS.  Ms. Moore's pleadings expressly alleged that Maryland CVS and CVS Pharmacy "owned, operated, maintained, and managed" the store premises.  An amendment to specify that CVS Pharmacy operated and managed the store under an agency agreement with Maryland CVS would not introduce any new cause of action.

Ms. Moore notes that CVS Pharmacy "withheld the existence of an agency agreement" with Maryland CVS until after the close of discovery.[6]  Although CVS Pharmacy never disputed that it had been properly served, CVS Pharmacy unwaveringly refused to respond to any discovery requests based on its unilateral assertion that it was "not a proper defendant" in the case.  CVS Pharmacy first disclosed the agency

---

[6] CVS Pharmacy denies withholding information about the agency relationship and claims that Ms. Moore failed to make discovery requests about the agency relationship.  To the contrary, Ms. Moore's interrogatories sought the disclosure of documents relating to the "control" or "management" of the Salisbury CVS store.  This interrogatory was broad enough to include an agreement under which CVS Pharmacy performs various management functions for Maryland CVS.

agreement with Maryland CVS in the Moffatt affidavit, filed with the reply in support of the summary judgment motion. Under the circumstances, it would be unreasonable to fault Ms. Moore for failing to allege the existence of the agency relationship before its disclosure. If CVS Pharmacy insists that the pleadings must expressly allege the existence of the agency relationship, there is no sound reason for a court to refuse to permit Ms. Moore to make such an amendment.

In sum, CVS Pharmacy failed to demonstrate that it was entitled to summary judgment on the ground that it did not operate, manage, control, or maintain the Salisbury CVS store. The evidence in the record, considered in the light most favorable to Ms. Moore, generated a genuine dispute of material fact about whether CVS Pharmacy operated or managed the Salisbury CVS store at the time of the accident. The actual extent of CVS Pharmacy's control over the store is a triable issue of fact.

### CONCLUSION

For the reasons stated in this opinion, we conclude that the circuit court erred by granting summary judgment in favor of Maryland CVS and CVS Pharmacy. The record shows that there are genuine disputes of material fact on the issues of whether the defendants knew or should have known of the alleged unsafe condition and whether CVS Pharmacy operated, managed, or controlled the Salisbury CVS store as an agent of Maryland CVS.[7] The defendants failed to demonstrate that they are entitled to judgment

---

[7] On remand, Ms. Moore is entitled to conduct discovery concerning the agency agreement between CVS Pharmacy and Maryland CVS and the nature and extent of CVS Pharmacy's operation, management, or control over the Salisbury CVS store.

in their favor as a matter of law.

**JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.**